(No. 62251.—

JANICE L. SIEMIENIEC *et al.*, Appellees, v. LU-THERAN GENERAL HOSPITAL *et al.* (Lutheran General Hospital *et al.*, Appellants).

*Opinion filed August 17, 1987.*

CLARK, C.J., took no part.

GOLDENHERSH, J., took no part in Part III.

WARD, J., concurring as to Parts I and III and dissenting as to Part II.

MILLER, J., specially concurring as to Parts I and II.

SIMON, J., specially concurring as to Part II and dissenting as to Parts I and III.

Cassiday, Schade & Gloor, of Chicago (Rudolf G. Schade, Jr., and John P. Stansbury, of counsel), for appellant Lutheran General Hospital.

Lord, Bissell & Brook, of Chicago (Harold L. Jacobson, Patricia J. Foltz and Hugh C. Griffin, of counsel), for appellant Michael Reese Hospital.

Kenneth L. Cunniff and Patrick J. Rocks, Jr., of Chicago, for appellees.

JUSTICE RYAN delivered the decision of the court and the following opinion. In the decision of the court, JUSTICE MORAN joins in Parts I, II and III; JUSTICE MILLER specially concurs in Parts I and II and joins in Part III; JUSTICE WARD concurs in Parts I and III; JUSTICE GOLDENHERSH joins in Parts I and II; and JUSTICE SIMON specially concurs in Part II:

This Cook County medical malpractice action involves interrelated issues dealing with the rights of parents and children to recover damages against health-care providers for what are commonly known as "wrongful birth" and "wrongful life" causes of action.

Janice Siemieniec conceived a child in February 1980. Mrs. Siemieniec's family history revealed that two of her deceased cousins had been afflicted with hemophilia. For purposes of general and descriptive information only, hemophilia is a genetic disorder caused by the deficiency or inactivity of coagulation factors needed for blood clotting. The hemophilias include both hemophilia A, or "classic hemophilia," in which the patient's plasma is deficient in factor VIII clotting activity, and hemophilia B, or "Christmas Disease," in which the patient's plasma is deficient in factor IX coagulation activity. Both types are

transmitted as a sex-linked recessive trait on the X chromosome. The usual familial pattern shows that only males are affected, that these individuals are related only via their mothers, and that their mothers are unaffected. See Bachman, *Recognition of Congenital Bleeding Disorders*, in Hemophilia (D. Green ed. 1973); A. Bloom, The Hemophilias 5-9 (1982); Kasper, *Hematologic Care*, in Comprehensive Management of Hemophilia 3-6 (D. Boone ed. 1976).

Concerned with a possible occurrence of this inherited coagulation disorder in her already conceived child, Mrs. Siemieniec, during the first trimester of her pregnancy, sought genetic counseling at Lutheran General Hospital to determine the likelihood of this contingency. Dr. Carol Booth, the director of the Department of Genetics at Lutheran General, advised Mrs. Siemieniec of the availability of prenatal genetic diagnostic tests (amniocentesis and fetal blood sampling) to determine the risk of her child being afflicted with hemophilia. Mrs. Siemieniec purportedly informed Dr. Booth of her desire to terminate the pregnancy by abortion if there was a substantial risk of her bearing a hemophilic child.

Dr. Booth referred Mrs. Siemieniec to Dr. Juan Chediak, a staff physician in the Division of Hematology/Oncology at Michael Reese Hospital. Dr. Chediak supplied Mrs. Siemieniec with similar information regarding genetic diagnostic and prenatal testing procedures. Dr. Chediak also promised to check on whether Mrs. Siemieniec's cousins were registered hemophiliacs and to examine her deceased cousin's death certificate.

Two weeks later, Dr. Chediak sent a letter to Dr. Booth opining that the risk of Mrs. Siemieniec being a carrier of classic hemophilia was "very low." Dr. Booth then sent a copy of this letter to Mrs. Siemieniec. Based upon this information, the Siemienics exercised a conscious choice to proceed with the pregnancy. As a result,

Adam Siemieniec was born on October 17, 1980, and after a bleeding episode, was diagnosed as a hemophiliac of the B type (Christmas Disease).

On the basis of these facts, Thomas and Janice Siemieniec, on their own behalf and on behalf of their son, Adam, filed a four-count complaint in the circuit court of Cook County against Dr. Booth, Dr. Chediak, Lutheran General Hospital, and Michael Reese Hospital. The complaint alleged that, as a direct and proximate result of the negligent diagnosis by the defendants and their failure to accurately advise Mrs. Siemieniec of the risk of the child's being born a hemophiliac, Adam Siemieniec was not aborted, to his personal injury and to the financial injury of his parents. The complaint sought damages for the extraordinary medical expenses the Siemieniecs will incur in caring for and treating Adam's hemophilic condition during his minority, for the extraordinary expenses Adam will incur for the care and treatment of his impaired physical condition after he reaches majority, and for the alleged emotional distress and mental anguish sustained by the Siemieniecs attendant to the raising and caring of a hemophiliac.

The circuit court denied the respective motions to dismiss filed by the defendants. Recognizing, however, that issues of law were present as to which there were substantial grounds for difference of opinion, the circuit court certified for appellate review three questions: (1) whether the child has a cause of action on his own behalf for extraordinary medical expenses during the age of majority; (2) whether the parents have a cause of action for the extraordinary medical expenses of the hemophilic child during his minority; and (3) whether the parents have a cause of action for negligent infliction of emotional distress.

The appellate court answered the first certified question in the affirmative: Adam has a cause of action in his

own behalf for extraordinary medical expenses during his majority. (134 Ill. App. 3d 823, 831-32.) The appellate court also answered the second certified question in the affirmative: Adam's parents have a cause of action to recover extraordinary medical expenses during his minority. (134 Ill. App. 3d 823, 826-30.) Finally, in answer to certified question No. 3, the appellate court held that, "absent allegations and proof of intentional and outrageous conduct, or that [Adam's parents] were at a high risk to themselves of physical impact resulting in their physical injury or illness by reason of the emotional distress caused by a defendant's negligence, [Adam's parents] have no cause of action for emotional distress damages." (134 Ill. App. 3d 823, 831.) We allowed the defendants' petition for leave to appeal pursuant to our Rule 315 (94 Ill. 2d R. 315).

We emphasize at the outset the procedural posture in which this case is now before this court. The question presented for review is not whether the plaintiffs should ultimately prevail in this litigation, but rather, more narrowly, whether the complaint states legally cognizable causes of action. Since our review is limited to an evaluation of the sufficiency of the complaint, we must accept as true all well-pleaded facts. (See *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 280; *Sierens v. Clausen* (1975), 60 Ill. 2d 585, 589; *O'Fallon Development Co. v. Ring* (1967), 37 Ill. 2d 84, 88.) Accordingly, we accept, without expressing any opinion as to the defendants' liability, the allegations that the defendants failed to adequately inform Mrs. Siemieniec about various types of hemophilia, for one of which, the type with which Adam is afflicted, Christmas Disease, there is no reliable test; failed to inquire adequately into Mrs. Siemieniec's own medical and health background; and failed to obtain the death certificate of Mrs. Siemieniec's cousin, which would have disclosed that he had a factor

IX clotting disorder, the same as Adam. We further accept the allegation that if Mrs. Siemieniec had been accurately advised of the chances that her already conceived child would be afflicted with hemophilia, then she would have terminated the pregnancy by abortion.

We turn now to the issues before us, whether actions for wrongful life and wrongful birth should be recognized in Illinois. The terms "wrongful life" and "wrongful birth" have been applied to a wide variety of medical malpractice actions brought by parents or by infants for damages growing out of unexpected or unwanted birth, or out of birth under conditions of disability or disadvantage. Because the courts and the commentators have been less than precise in their utilization of these terms, the legal and theoretical distinctions between the torts often have been blurred. Hence, thoughtful analysis of the validity of wrongful birth and wrongful life as emerging legal concepts requires, in the first instance, a clear understanding of the alleged wrong upon which the cause of action is predicated.

"Wrongful birth" refers to the claim for relief of parents who allege they would have avoided conception or terminated the pregnancy by abortion but for the negligence of those charged with prenatal testing, genetic prognosticating, or counseling parents as to the likelihood of giving birth to a physically or mentally impaired child. The underlying premise is that prudent medical care would have detected the risk of a congenital or hereditary genetic disorder either prior to conception or during pregnancy. As a proximate result of this negligently performed or omitted genetic counseling or prenatal testing, the parents were foreclosed from making an informed decision whether to conceive a potentially handicapped child or, in the event of a pregnancy, to terminate the same. See Trotzig, *The Defective Child and the Actions for Wrongful Life and Wrongful Birth*, 14

Fam. L.Q. 15, 16-17 (1980); Comment, *Damages For Wrongful Birth and Wrongful Pregnancy in Illinois*, 15 Loy. U. Chi. L.J. 799, 799-800 (1984); Comment, *Wrongful Life and Wrongful Birth Causes of Action—Suggestions for a Consistent Analysis*, 63 Marq. L. Rev. 611, 621-23 (1980); Comment, *"Wrongful Life": The Right Not to be Born*, 54 Tul. L. Rev. 480, 484-85 (1980); see generally 1 Dooley, Modern Tort Law sec. 14.06 (1982).

The corresponding action by or on behalf of an infant who suffers from a genetic or congenital disorder is denominated one for "wrongful life." The child claims that the physician or other health-care provider: (1) failed to accurately perform genetic screening tests prior to conception or to correctly inform the prospective parents of the hereditary nature of certain genetic disorders; (2) failed to accurately advise, counsel, or test his parents during pregnancy concerning genetic or teratogenic risks associated with childbirth suggested by maternal age, physical condition, family medical history, or other circumstances particular to the parents; or (3) failed to perform a surgical procedure intended to prevent the birth of a congenitally or genetically defective child. In a wrongful life case, the child does not assert that the negligence of the defendants caused his inherited or congenital abnormality, that the defendants could have done anything that would have decreased the possibility that he would be born with such defects, or that he ever had a chance to be normal. The essence of the child's claim is that the medical professional's breach of the applicable standard of care precluded an informed parental decision to avoid his conception or birth. But for this negligence, the child allegedly would not have been born to experience the pain and suffering attributable to his affliction. See DeVries & Rifkin, *Wrongful Life, Wrongful Birth, and Wrongful Pregnancy: Judicial Divergence in the Birth-Related Torts*, 20 Forum 207, 211 (1985); Rogers,

*Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling & Prenatal Testing*, 33 S.C. L. Rev. 713, 715-16 (1982); Comment, *A Preference for Nonexistence: Wrongful Life and a Proposed Tort of Genetic Malpractice*, 55 S. Cal. L. Rev. 477 n.2 (1982); Comment, *Wrongful Life: A Misconceived Tort*, 15 U.C. Davis L. Rev. 447, 450 n.13 (1981); Note, *Wrongful Life: A Modern Claim Which Conforms to the Traditional Tort Framework*, 20 Wm. & Mary L. Rev. 125 (1978); Note, *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling*, 87 Yale L.J. 1488, 1500-02 (1978); see generally Am. Jur. 2d New Topic Service, *Right to Die; Wrongful Life* sec. 63 (1979 & Supp. 1986).

To be distinguished from the actions before us are those in which recovery is sought for what is appropriately labeled "wrongful conception or pregnancy." Liability is based either on the physician's negligence in performing a sterilization procedure or an abortion or the pharmacist's or pharmaceutical manufacturer's negligence in preparing or dispensing a contraceptive prescription. The essence of the wrong for which compensation is sought in some cases is the birth of a healthy and normal—albeit, unplanned and unwanted—child. See W. Prosser & W. Keaton, Torts sec. 55, at 372-73 (5th ed. 1984); Hampton, *The Continuing Debate Over the Recoverability of the Costs of Child-Rearing in "Wrongful Conception" Cases: Searching for Appropriate Judicial Guidelines*, 20 Fam. L.Q. 45, 47-48 (1986); Holt, *Wrongful Pregnancy*, 33 S.C. L. Rev. 759, 763-92 (1982); Kashi, *The Case of the Unwanted Blessing: Wrongful Life*, 31 U. Miami L. Rev. 1409, 1410-19 (1977); Robertson, *Civil Liability Arising From "Wrongful Birth" Following an Unsuccessful Sterilization Operation*, 4 Am. J.L. & Med. 131, 132-35 (1978); see generally Annot., 83 A.L.R.3d 15 (1978).

## Part I. Child's Claim for "Wrongful Life"

Having defined the scope of our inquiry, we first consider the action on behalf of the son, Adam, for the extraordinary medical expenses which he expects to incur after reaching his majority. Although the cause of action at issue has attracted a special name—"wrongful life"— Adam's basic contention is that his action is simply one form of the familiar medical or professional malpractice action. The gist of Adam's claim is that he has suffered harm or damage as a result of the defendants' negligent performance of their professional tasks, and that, as a consequence, he is entitled to recover the extraordinary expenses associated with his disability under generally applicable common law tort principles.

The overwhelming majority of jurisdictions, including Illinois, have rejected claims for relief brought by or on behalf of genetically or congenitally impaired children against medical professionals whose negligent failure to predict or to diagnose their congenital or genetic disease was allegedly the proximate cause of their birth and having to live in an impaired condition. See, *e.g.*, *Phillips v. United States* (D.S.C. 1980), 508 F. Supp. 537 (applying South Carolina law) (Down's syndrome); *Moores v. Lucas* (Fla. App. 1981), 405 So. 2d 1022 (Larsen's syndrome); *Blake v. Cruz* (1984), 108 Idaho 253, 698 P.2d 315 (congenital rubella syndrome); *Goldberg v. Ruskin* (1986), 113 Ill. 2d 482 (Tay-Sachs disease); *Bruggeman v. Schimke* (Kan. 1986), 718 P.2d 635 (Down's syndrome); *Strohmaier v. Associates in Obstetrics & Gynecology, P.C.* (1982), 122 Mich. App. 116, 332 N.W.2d 432 (congenital rubella syndrome); *Azzolino v. Dingfelder* (1985), 315 N.C. 103, 337 S.E.2d 528 (Down's syndrome); *Smith v. Cote* (1986), 128 N.H. 231, 513 A.2d 341 (congenital rubella syndrome); *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 386 N.E.2d 807 (Down's syndrome and polycystic

kidney disease); *Ellis v. Sherman* (1986), 512 Pa. 14, 515 A.2d 1327 (congenital neurofibromatosis); *Nelson v. Krusen* (Tex. 1984), 678 S.W.2d 918 (Duchenne muscular dystrophy); *James G. v. Caserta* (W. Va. 1985), 332 S.E.2d 872 (Down's syndrome); *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 233 N.W.2d 372 (congenital rubella syndrome); see also *Elliott v. Brown* (Ala. 1978), 361 So. 2d 546 (wrongful life claim on behalf of a seriously deformed child born following a negligently performed vasectomy dismissed for failure to state a legally cognizable cause of action); *Miller v. Du Hart* (Mo. App. 1982), 637 S.W.2d 183 (wrongful life claim of a child born after a negligently performed bilateral tubal ligation dismissed for failure to state a legally cognizable cause of action); *Beardsley v. Wierdsma* (Wyo. 1982), 650 P.2d 288 (wrongful life claim on behalf of a child born after an unsuccessful tubal ligation dismissed for failure to state a legally cognizable cause of action). But see *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 643 P.2d 954, 182 Cal. Rptr. 337; *Continental Casualty Co. v. Empire Casualty Co.* (Colo. App. 1985), 713 P.2d 384; *Procanik v. Cillo* (1984), 97 N.J. 339, 478 A.2d 755; *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483.

The systematic rejection of wrongful life claims rests upon two intimately related grounds. The first ground is the courts' unwillingness to hold that a child can recover damages for achieving life. The threshold problem has been the assertion by the infant plaintiffs not that they should not have been born without defects, but that they should not have been born at all. The essence of the infant's cause of action is that the negligent conduct of the defendants deprived the child's mother from obtaining an abortion which would have terminated its existence. Resting on the belief that human life, no matter how burdened, is, as a matter of law, always preferable to

nonlife, the courts have been reluctant to find that the infant has suffered a legally cognizable injury by being born with a congenital or genetic impairment as opposed to not being born at all. See *Elliott v. Brown* (Ala. 1978), 361 So. 2d 546, 547-48; *Blake v. Cruz* (1985), 108 Idaho 253, 260, 698 P.2d 315, 322; *Bruggeman v. Schimke* (Kan. 1986), 718 P.2d 635, 640-42; *Smith v. Cote* (1986), 128 N.H. 231, 248, 513 A.2d 341, 352; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 411, 386 N.E.2d 807, 812; *Azzolino v. Dingfelder* (1985), 315 N.C. 103, 110, 337 S.E.2d 528, 533; *Ellis v. Sherman* (1986), 512 Pa. 14, 19, 515 A.2d 1327, 1329.

The second basis relied upon by those courts refusing to recognize a cause of action for wrongful life is the difficulty, if not impossibility, of measuring appropriate damages. The traditional tort remedy is compensatory in nature. The basic rule of tort compensation is that the plaintiff be put in the position that he would have been in absent the defendant's negligence. The damages recoverable on behalf of a child for wrongful life are limited to those necessary to restore the child to the position he would have occupied were it not for the alleged malpractice of the physician or other health-care provider. In a wrongful life case, there is no allegation that but for the defendant's negligence the child would have had a healthy, unimpaired life. Instead, the claim is that without the defendants' negligence, the child never would have been born. Thus, the cause of action involves a calculation of damages dependent upon the relative benefits of an impaired life as opposed to no life at all, "[a] comparison the law is not equipped to make." *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 412, 386 N.E.2d 807, 812; see *Moores v. Lucas* (Fla. Dist. App. 1981), 405 So. 2d 1022, 1025; *Strohmaier v. Associates in Obstetrics & Gynecology, P.C.* (1982), 122 Mich. App. 116, 120-22, 332 N.W.2d 432, 434-35; *Nelson v. Krusen*

(Tex. 1984), 678 S.W.2d 918, 924-25; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 773, 233 N.W.2d 372, 375-76.

In holding that Adam has a cause of action in his own behalf for the extraordinary medical expenses during his majority, the appellate court in this case emphasized that the "action articulated on Adam's behalf claims a real rather than a theoretical injury. It is definable by recognized tort standards and seeks recompense only for extraordinary expenses, not damages for being born impaired as against the value of not being born at all. (See, *e.g., Procanik v. Cillo* (1984), 97 N.J. 339, 478 A.2d 755.) Adam's complaint does not require ontological discussion; merely the right to prove, if he can, what his unusual condition will cost when he reaches majority." (134 Ill. App. 3d 823, 834.) Citing *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, for the proposition that an infant has a right to be free from injuries foreseeably caused by a breach of duty to the child's mother, the appellate court concluded that "the health care providers involved in the present case could have reasonably foreseen that [Adam's] life would be impaired by being born with hemophilia, at least to the extent of requiring extraordinary treatment with concomitant expenses." 134 Ill. App. 3d 823, 833.

The basic fallacy of the appellate court's analysis is that it ignores the essential nature of the defendants' alleged wrong and obscures a critical difference between wrongful life actions and the ordinary prenatal-injury case. In an ordinary prenatal-injury case, if the defendant had not been negligent, then the child would have been born healthy. (See *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348 (recognizing a cause of action on behalf of a child who suffered severe prenatal injuries as a result of defendants' negligent administration of an Rh-positive blood transfusion to her Rh-negative mother

nine years prior to the child's conception); see also Annot., 91 A.L.R.3d 316 (1979).) In the present case, by contrast, the undisputable tragic fact is that Adam never had a chance to be born as a whole, functional human being without hemophilia. It is alleged that if the defendants would have performed their tasks properly, then an abortion would have been procured. However, in such an event, Adam never would have come into existence. Because children with genetic disorders such as Adam are impaired from the moment of conception, it is impossible for them to have a fundamental right to be born as whole individuals. Hence, the only alternative to their suffering, and the standard against which their compensation must be determined, is nonexistence. (See Kelley, *Wrongful Life, Wrongful Birth, and Justice in Tort Law*, 4 Wash. U.L.Q. 919, 934 (1979); Robertson, *Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life*, 1978 Duke L.J. 1401, 1444; Robertson, *Procreative Liberty and the Control of Conception, Pregnancy, and Childbirth*, 69 Va. L. Rev. 405, 440 (1983).) Recognition of a cause of action for wrongful life in this case would therefore require this court to find that Adam had an interest in avoiding his own birth, *i.e.*, that there is a fundamental legal right not to be born when birth would necessarily entail a life of hardship. (See Comment, *Wrongful Life and Wrongful Birth Causes of Action—Suggestions for a Consistent Analysis*, 63 Marq. L. Rev. 611, 620 (1980).) Such a finding, however, would essentially require us to possess the divine ability to determine what defects should prevent an embryo from being allowed life so that denial of the opportunity to terminate the existence of such a defective child in embryo supports a cause of action. See *Goldberg v. Ruskin* (1986), 113 Ill. 2d 482, 489 ("The argument that the child was in some meaningful sense harmed by

being born and would have been better off not being born suggests that there is a perspective, apart from our life and world, from which one can stand and say that he finds nonexistence preferable to existence").

The New York Court of Appeals in *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 386 N.E.2d 807, aptly summarized the dilemma faced by a court when it is confronted with a claim by a physically or mentally impaired child that he sustained injury in being born with a congenital or genetic ailment as opposed to not being born at all.

> "Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. Not only is there to be found no predicate at common law or in statutory enactment for judicial recognition of the birth of a defective child as an injury to the child; the implications of any such proposition are staggering. Would claims be honored, assuming the breach of an identifiable duty, for less than a perfect birth? And by what standard or by whom would perfection be defined?" 46 N.Y.2d 401, 411, 386 N.E.2d 807, 812.

*Elliott v. Brown* (Ala. 1978), 361 So. 2d 546, *Smith v. Cote* (1986), 128 N.H. 231, 513 A.2d 341, and *Ellis v. Sherman* (1986), 512 Pa. 14, 515 A.2d 1327, are also cases in which the courts discussed the basis for the unwillingness to find that a defective child had sustained a legally cognizable injury in being born with physical deformities as opposed to not being born at all.

In rejecting the wrongful life claim of a seriously deformed child born following a negligently performed vasectomy, the Supreme Court of Alabama in *Elliott* observed:

"Upon what legal foundation is the court to determine that it is better not to have been born than to be born with deformities? If the court permitted this type of cause of action, then what criteria would be used to determine the degree of deformity necessary to state a claim for relief. We decline to pronounce judgment in the imponderable area of nonexistence." (*Elliott v. Brown* (Ala. 1978), 361 So. 2d 546, 548.)

In *Smith*, the New Hampshire Supreme Court, in denying the wrongful life claim of a child born with congenital rubella syndrome, couched this dilemma in terms of public policy:

"[C]ompelling policy reasons militate against recognition of wrongful life claims. The first such reason is our conviction that the courts of this State should not become involved in deciding whether a given person's life is or is not worthwhile. As one commentator has written, '[i]f plaintiff prevails, the result is a formal judicial declaration that it would have been better if plaintiff had not been born.' Kelley, [*Wrongful Life, Wrongful Birth, and Justice in Tort Law*, 4 Wash. U.L.Q. 919, 942 (1979)]." (*Smith v. Cote* (1986), 128 N.H. 231, 248, 513 A.2d 341, 352.)

In holding that a child born with a virulent form of neurofibromatosis had no cause of action for the alleged injury of his birth, the Supreme Court of Pennsylvania, in *Ellis*, reasoned:

"It cannot escape our judicial notice that many diseased and deformed persons live contented lives and make significant social and personal contributions. Were we to recognize the child's claim that it was injured by being denied nonexistence, we would be required to speculate that this child, unlike other similarly situated persons, would be unable to derive any significant meaning, pleasure or satisfaction from its life, and therefore, that its *life* is of such minimal benefit as to constitute an injury. Because we have no way of knowing what opportunities will be available to this child or how the child will

respond to life in general, we cannot say how the child's pain and suffering will compare to the benefits of its life, and thus, we cannot determine that its life constitutes an injury." (Emphasis in original.) *Ellis v. Sherman* (1986), 512 Pa. 14, 19, 515 A.2d 1327, 1329.

The insurmountable line-drawing problems courts will face in determining the level of impairment that warrants recovery has led one commentator to recommend nonrecognition of wrongful life claims:

"Line-drawing problems arise in considering what level of impairment a court will find serious enough to compel recovery. The weak facts in *Turpin* [*Turpin v. Sortini* (1982), 31 Cal. 3d 220, 643 P.2d 954, 182 Cal. Rptr. 337], the leading California wrongful life decision, indicate that concern about line-drawing is not unwarranted. The related concern, that courts may be faced with numerous frivolous claims, also has some merit; any number of adverse circumstances could, from the infant's point of view, constitute a wrongful life. For example, being born to a particular race, to a poor family, or with brown eyes could cause an infant to claim that his or her life was wrongfully conceived. The mere possibility that frivolous claims may be brought, however, is not a strong argument against recognizing wrongful life claims.

If the child's point of view is not determinative, and an objective, reasonable person standard is applied in deciding to award wrongful life damages, frivolous claims may no longer be a problem, but line-drawing still comes into play. *Judges and juries will have to determine the degree of impairment that renders a child's nonexistence preferable to existence. Not only will such a judgment be unpalatable, but persons making this judgment can look only to their own feelings or fears of being handicapped in deciding the merits of the claim.* This may reinforce prejudicial judgments that certain handicapped plaintiffs always deserve compensation, while healthy infants born in other adverse circumstances never deserve legal compensation for their birth." (Emphasis added.) Comment, *The*

*Trend Toward Judicial Recognition of Wrongful Life: A Dissenting View*, 31 U.C.L.A. L. Rev. 473, 498-99 (1983).

Because no right not to be born, even into a life of hardship, has ever been recognized in our judicial system, Adam Siemieniec has suffered no legally cognizable injury by being brought into existence afflicted with hemophilia. Adam, nevertheless, urges us to follow the supreme courts of California, New Jersey, and Washington, which have permitted children to pursue wrongful life actions limited to the recovery of special damages attributable to the extraordinary medical expenses expected to be incurred during the child's lifetime in the management, treatment, and care of congenital or genetic ailments. (See *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 643 P.2d 954, 182 Cal. Rptr. 337 (hereditary deafness); *Procanik v. Cillo* (1984), 97 N.J. 339, 478 A.2d 755 (congenital rubella syndrome); *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483 (fetal hydantoin syndrome).) We are not persuaded, however, by the reasoning of these courts.

In *Turpin*, the California Supreme Court, in denying general damages for pain and suffering resulting from the failure to diagnose a hereditary deafness, reasoned "(1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner." (*Turpin v. Sortini* (1982), 32 Cal. 3d 220, 235, 643 P.2d 954, 963, 182 Cal. Rptr. 337, 346.) In awarding special damages, however, the *Turpin* court ignored the reasoning that prevented an award of general damages. The problem of establishing the fact of injury was simply passed over, and all discussion focused on the nonspeculative nature of a recovery for extraordinary medical expenses. See

Comment, *Wrongful Life: A Legislative Solution to Negligent Genetic Counseling*, 18 U.S.F. L. Rev. 77, 98 (1983) ("[a]n award which denies general damages because they are 'impossible to determine' and at the same time permits special damages for the same tort is inconsistent"); Note, *Turpin v. Sortini: Recognizing the Unsupportable Cause of Action for Wrongful Life*, 71 Cal. L. Rev. 1278, 1292 (1983) ("No wrongful life plaintiff, even with severe defects, can prove she has suffered harm, and the obstacle is not merely that damage calculations are speculative. The court acknowledged this fact, yet reached an inconsistent result").

Similarly, in *Harbeson*, the Washington Supreme Court acknowledged that "[t]he most controversial element of the [wrongful life] analysis in other jurisdictions has been injury and the extent of damages" and conceded that "measuring the value of an impaired life as compared to nonexistence is a task that is beyond mortals, whether judges or jurors." (*Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 482, 656 P.2d 483, 496.) The *Harbeson* court, nevertheless, proceeded to a discussion of the calculation of special damages, without explaining how the difficulty in determining the existence of the element of injury had been overcome. See Note, *Washington Recognizes Wrongful Birth and Wrongful Life—A Critical Analysis*, 58 Wash. L. Rev. 649, 677-78 (1983) ("[T]he court's logic does not support its conclusions. It failed to demonstrate that birth with defects is an injury to the child").

Like California and Washington, the New Jersey Supreme Court in *Procanik*, in denying general damages for failure to diagnose congenital rubella syndrome, recognized that "[t]he crux of the problem is that there is no rational way to measure non-existence or to compare non-existence with the pain and suffering of [the child's] impaired existence." (*Procanik v. Cillo* (1984), 97 N.J.

339, 353, 478 A.2d 755, 763.) The *Procanik* court, however, awarded special damages. It reasoned: "Our decision to allow the recovery of extraordinary medical expenses is not premised on the concept that non-life is preferable to an impaired life, but is predicated on the needs of the living. We seek only to respond to the call of the living for help in bearing the burden of their affliction." 97 N.J. 339, 353, 478 A.2d 755, 763.

Although the California, Washington, and New Jersey decisions allowed limited recovery while failing to establish the logical basis for the wrongful life action—the existence of harm or injury to the impaired child—this court is unwilling to discard the requirement of a legally cognizable injury in a negligence medical malpractice case. (See *Purtill v. Hess* (1986), 111 Ill. 2d 229, 241-42; *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423.) As Justice Robertson cogently observed in his concurring opinion in *Nelson v. Krusen* (Tex. 1984), 678 S.W.2d 918, 930, "[a] court should not *** discard established principles of tort law sub silentio in an attempt to reach a 'right' result. Close examination of the California and Washington opinions reveals such an unexplained gap in the decisional reasoning." We therefore conclude that Adam's claim for relief for the extraordinary medical expenses which he expects to incur during his majority is not actionable because the alleged negligent conduct complained of, even if true, does not give rise to an injury cognizable at law.

In addition to the apparent absence of any legally cognizable injury, public policy considerations preclude this court from allowing an infant such as Adam to recover damages for the extraordinary medical expenses incurred as a result of being born with a congenital or genetic disorder. As noted earlier, the basis of Adam's claim is that the defendants failed to accurately advise

his parents of the risks of his being born with hemophilia, and that their inaccurate report that his mother would give birth to a normal male child induced her to carry to term instead of aborting the fetus, resulting in his birth with a hemophilic condition that will require special treatment throughout his lifetime.

Section 1 of the Illinois Abortion Law of 1975 (Ill. Rev. Stat. 1985, ch. 38, par. 81—21 *et seq.*) evinces Illinois' strong public policy of preserving the sanctity of human life, even in its imperfect state:

> "It is the intention of the General Assembly of the State of Illinois to reasonably regulate abortion in conformance with the decisions of the United States Supreme Court of January 22, 1973. Without in any way restricting the right of privacy of a woman or the right of a woman to an abortion under those decisions, the General Assembly of the State of Illinois [does] solemnly declare and find[,] in reaffirmation of the *longstanding policy of this State, that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and Constitution of this State*. Further, the General Assembly finds and declares that longstanding policy of this State to protect the right to life of the unborn child from conception by prohibiting abortion unless necessary to preserve the life of the mother is impermissible *only* because of the decisions of the United States Supreme Court and that, therefore, if those decisions of the United States Supreme Court are ever reversed or ˙modified or the United States Constitution is amended to allow protection of the unborn then the former policy of this State to prohibit abortions unless necessary for the preservation of the mother's life shall be reinstated." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 81—21.)

To recognize that Adam has a fundamental right not to be born would thus undermine this legislatively expressed policy favoring childbirth over abortion.

A number of courts have relied on "the preciousness and sanctity of human life" in refusing to recognize wrongful life as a legally cognizable cause of action. These courts have reasoned that recognizing a duty to the unborn child to prevent his birth with defects represents a "disavowal" of the sanctity of life. Such a disavowal of life offends society's deeply rooted belief that life, in whatever condition, is more precious than nonexistence. This policy consideration was expressed with some sentimentality by the Supreme Court of Idaho, in *Blake v. Cruz* (1984), 108 Idaho 253, 618 P.2d 315:

> "Basic to our culture is the precept that life is precious. As a society, therefore, our laws have as their driving force the purpose of protecting, preserving and improving the quality of human existence. To recognize wrongful life as a tort would do violence to that purpose and is completely contradictory to the belief that life is precious. The fact that Dessie Blake will live in a severely disabled condition is unquestionably a tragedy; nevertheless, we agree *** that 'life—whether experienced with or without a major physical handicap—is more precious than nonlife.' *** Thus, because Dessie Blake has suffered no legally cognizable wrong by being born, she has no cause of action." (108 Idaho 253, 260, 698 P.2d 315, 322.)

Similarly, in *Bruggeman v. Schimke* (Kan. 1986), 718 P.2d 635, 642, the Supreme Court of Kansas explained:

> "We are convinced that an action for wrongful life should not be judicially recognized in Kansas. It has long been a fundamental principle of our law that human life is precious. Whether the person is in perfect health, in ill health, or has or does not have impairments or disabilities, the person's life is valuable, precious, and worthy of protection. A legal right not to be born—to be dead, rather than to be alive with deformities—is a theory completely contradictory to our law."

Likewise, in *Elliott v. Brown* (Ala. 1978), 361 So. 2d 546, 548, the Supreme Court of Alabama reasoned:

"Fundamental to the recognition of such a cause of action is the notion that the defendant has violated some legal right of plaintiff's and as a result she has suffered injury. However, a legal right not to be born is alien to the public policy of this State to protect and preserve human life. The right of women in certain cases to have abortions does not alter the policy."

Finally, in *Berman v. Allan* (1979), 80 N.J. 421, 404 A.2d 8, overruled in part in *Procanik v. Cillo* (1984), 97 N.J. 339, 478 A.2d 755, the New Jersey Supreme Court stated:

"No man is perfect. Each of us suffers from some ailments or defects, whether major or minor, which make impossible participation in all the activities the world has to offer. But our lives are not thereby rendered less precious than those of others whose defects are less pervasive or less severe.

*** Notwithstanding her affliction with Down's Syndrome, Sharon, by virtue of her birth, will be able to love and be loved and to experience happiness and pleasure— emotions which are truly the essence of life and which are far more valuable than the suffering she may endure. To rule otherwise would require us to disavow the basic assumption upon which our society is based. This we cannot do." 80 N.J. 421, 430, 404 A.2d 8, 13.

We find the reasoning of these courts persuasive. Though we sympathize with the unfortunate situation in which Adam finds himself, the public policy of this State to protect and to preserve the sanctity of all human life, as expressed in section 1 of the Illinois Abortion Law of 1975, militates against the judgment that an individual life is so wretched that one would have been better off not to exist. We therefore hold that claims for relief for the wrongful life of congenitally or genetically defective children should not be recognized in this State absent clear legislative guidance.

   As evidenced by the numerous literary efforts cited above, wrongful life claims have stimulated considerable debate in the legal community. (See 3 Damages in Tort Actions (Matthew Bender) Bibliography (1986) for an exhaustive list of scholarly commentary.) Although the commentators are split on the appropriateness of wrongful life actions, we are persuaded by the reasoning of those writers who oppose judicial recognition· of claims for wrongful life. (See, *e.g.*, Kelley, *Wrongful Life, Wrongful Birth, and Justice in Tort Law*, 4 Wash. U.L.Q. 919, 934-42 (1979); Robertson, *Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life*, 1978 Duke L.J. 1401, 1439-45; Comment, *Wrongful Life and Wrongful Birth Causes of Action—Suggestions for a Consistent Analysis*, 63 Marq. L. Rev. 611, 612-21 (1979); Comment, *Wrongful Life: A Misconceived Tort*, 15 U.C. Davis L. Rev. 447, 458-64; Comment, *The Trend Toward Judicial Recognition of Wrongful Life: A Dissenting View*, 31 U.C.L.A. L. Rev. 473, 492-500 (1981); Note, *Turpin v. Sortini: Recognizing the Unsupportable Cause of Action for Wrongful Life*, 71 Cal. L. Rev. 1278, 1286-96 (1983); Note, *Washington Recognizes Wrongful Birth and Wrongful Life—A Critical Analysis*, 58 Wash. L. Rev. 649, 659-76 (1983); Note, *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling*, 87 Yale L.J. 1488, 1500-02 (1978). For commentary arguing that courts should uphold wrongful life claims, see generally Peters & Peters, *Wrongful Life: Recognizing the Defective Child's Right to a Cause of Action*, 18 Duq. L. Rev. 857 (1980); Wagner, *Wrongful Life: Is Denial of This Cause of Action Consistent With Current Tort Law?*, 1983 Med. Trial Tech. Q. 137; Note, *Wrongful Life—A Tort Whose Time Has Come*, 2 Am. J. Trial Advoc. 107 (1978); Note, *Wrongful Life: A Modern Claim Which Conforms to the*

*Traditional Tort Framework*, 20 Wm. & Mary L. Rev. 125 (1978).) Accordingly, the lower courts erred in denying the defendants' motion to dismiss Adam's claim for relief for the extraordinary expenses he will incur in managing and treating his hemophilic condition after he reaches majority.

## Part II. Parents' Claim for "Wrongful Birth"

We next consider the claim for relief on behalf of Thomas and Janice Siemieniec. As in the case of their child, the Siemieniecs do not assert that the defendants either caused Adam's inherited genetic disorder or increased the risk that Adam, if born, would be afflicted with hemophilia. Rather, they allege that they were tortiously injured because Mrs. Siemieniec was deprived of the option of making an informed and meaningful decision either to abort the already existing and defective fetus, a decision which, at least during the first trimester of pregnancy, is not subject to State interference, or to give birth to a potentially genetically defective child. In essence, they claim that Adam's birth was wrongful. In *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, this court held that the costs of rearing a normal, healthy child cannot be recovered as damages to the parents in wrongful pregnancy actions. Therefore, in this case only two items of damages are requested by the Siemieniecs to redress their allegedly tortious injury: (1) the extraordinary medical and related expenses that will be incurred in order to properly manage and treat Adam's hemophilic condition during his minority; and (2) compensation for the emotional anguish and suffering that has been and will continue to be experienced on account of Adam's hereditary affliction.

The defendants, in response, assert three reasons why this court should not recognize the tort of wrongful birth. First, contrary to the Siemieniecs' contention, nei-

ther wrongful birth nor wrongful life claims can be analyzed in terms of the traditional tort framework. In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a *resulting injury* proximately caused by the physician's want of skill or care. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 241-42; *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423.) A claim for wrongful life by the child for having been born in an impaired condition is predicated upon the assumption that life itself is an injury. The parents' claim for wrongful birth rests upon the injury to the mother by virtue of the physician's or other health-care provider's negligence, resulting in the mother's being deprived of the right to make an informed choice either to prevent the child's conception or to terminate the child's life by abortion. Thus, the defendants argue, in wrongful life and wrongful birth cases the injury complained of is life itself. In either case, however, in order to support such a claim this court would have to conclude that life, even with severe defects, can be an injury. The defendants find compelling the view of the Supreme Court of North Carolina in a case rejecting the parents' claim for wrongful birth:

> "We again assume *arguendo* that the defendants owed the plaintiffs a duty and that they breached that duty. The issue of whether the breach of duty was the proximate cause of the 'injury' to the plaintiff parents is more problematic, since even the plaintiffs acknowledge that the fetus which was to be Michael Azzolino was in existence and already genetically defective at the time the defendants first came into contact with the plaintiffs. We also assume *arguendo*, however, that the birth of Michael

Azzolino was the proximate result of the defendants' negligence.

Courts which purport to analyze wrongful birth claims in terms of 'traditional' tort analysis are able to proceed to this point but no further before their 'traditional' analysis leaves all tradition behind or begins to break down. In order to allow recovery such courts must then take a step into *entirely untraditional analysis* by holding that the existence of a human life can constitute an injury cognizable at law. Far from being 'traditional' tort analysis, such a step requires a view of human life previously unknown to the law of this jurisdiction. We are unwilling to take any such step because we are unwilling to say that life, even life with severe defects, may ever amount to a legal injury." (Emphasis in original.) *Azzolino v. Dingfelder* (1985), 315 N.C. 103, 110-11, 337 S.E.2d 528, 533-34.

As a second argument, the defendants claim that the Siemieniecs' cause of action is premised on the claimed denial of their opportunity to terminate the life of their child while he was an embryo. Therefore, the defendants argue, the only damages the Siemieniecs allege they have suffered arise, if at all, from their alleged failure to prognosticate probable hemophilia in the Siemieniecs' unborn child, which would have led to abortion of the already existing and genetically defective fetus. Public policy reasons, the defendants assert, prevent this court from allowing tort damages for the denial of the opportunity to take an embryonic life. No case cited by the Siemieniecs involves a public policy statement such as the strong condemnation of abortion and support of the right to life as expressed in section 1 of the Illinois Abortion Law of 1975 (Ill. Rev. Stat. 1985, ch. 38, par. 81—21), quoted earlier in this opinion. Although the right of a woman to seek an abortion free from State interference is constitutionally protected during the first trimester of her pregnancy (*Thornburgh v. American*

*College of Obstetricians & Gynecologists* (1986), 476 U.S. 747, 759, 90 L. Ed. 2d 779, 793, 106 S. Ct. 2169, 2178; *Roe v. Wade* (1973), 410 U.S. 113, 164-65, 35 L. Ed. 2d 147, 183-84, 93 S. Ct. 705, 732-33), the defendants maintain that to ignore a public policy which deems precious even potential life while yet in the womb would be a flagrant misuse of this court's role as a tribunal designed to implement societal values and not to create them.

Finally, the defendants find support for their position in this court's earlier decision of *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193. While that case involved the extent of damages that may be recovered in a negligence action based on a "wrongful pregnancy," the defendants assert that *Cockrum* is noteworthy for its extensive public policy analysis. In holding that the costs of rearing a normal, healthy child cannot be recovered as damages to the parents, this court reasoned:

> "One can, of course, in mechanical logic reach a different conclusion, but only on the ground that human life and the state of parenthood are compensable losses. In a proper hierarchy of values the benefit of life should *not* be outweighed by the expense of supporting it. *Respect for life and the righps proceeding from it are at the heart of our legal system and, broader still, our civilization.*" (Emphasis added.) (95 Ill. 2d 193, 200-01.)

Allowing tort damages here for the deprivation of the opportunity to accept or to reject the consequence of a pregnancy, the defendants claim, would be inconsistent with this court's pro-life position in *Cockrum* and with the strong public policy statement in our abortion law.

The courts which have considered wrongful birth claims have been almost unanimous in their recognition of a cause of action against a physician or other health-care provider where it is alleged that but for the defendants' negligence the parents would have terminated the congenitally or genetically defective fetus by abortion.

See, *e.g., Robak v. United States* (7th Cir. 1981), 658 F.2d 471 (applying Alabama law); *Phillips v. United States* (D.S.C. 1981), 544 F. Supp. 508 (applying South Carolina law); *Gildiner v. Thomas Jefferson University Hospital* (E.D. Pa. 1978), 451 F. Supp. 692 (applying Pennsylvania law); *Moores v. Lucas* (Fla. App. 1981), 405 So. 2d 1022; *Blake v. Cruz* (1984), 108 Idaho 253, 698 P.2d 315; *Eisbrenner v. Stanley* (1981), 106 Mich. App. 357, 308 N.W.2d 209; *Smith v. Cote* (1986), 128 N.H. 231, 513 A.2d 341; *Schroeder v. Perkel* (1981), 87 N.J. 52, 432 A.2d 834; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 386 N.E.2d 807; *Speck v. Finegold* (1981), 497 Pa. 76, 439 A.2d 110; *Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 846; *Naccash v. Burger* (Va. 1982), 290 S.E.2d 825; *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483; *James G. v. Caserta* (W. Va. 1985), 332 S.E.2d 872; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 233 N.W.2d 372. But see *Azzolino v. Dingfelder* (1985), 315 N.C. 103, 337 S.E.2d 528.

Judicial acceptance of wrongful birth as a legally cognizable cause of action is premised on a number of recurrent rationales. Many courts have accepted wrongful birth as a cause of action on the theory that it is a logical and necessary extension of existing principles of tort law. (*E.g., Eisbrenner v. Stanley* (1981), 106 Mich. App. 357, 366-67, 308 N.W.2d 209, 213; *Schroeder v. Perkel* (1981), 87 N.J. 53, 62, 432 A.2d 834, 838; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 412-13, 386 N.E.2d 807, 813; *Naccash v. Burger* (Va. 1982), 290 S.E.2d 825, 829; *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 466-67, 656 P.2d 483, 488; *James G. v. Caserta* (W. Va. 1985), 332 S.E.2d 872, 882.) Some courts have recognized the cause of action because of the expanding ability of medical technology to accurately detect and predict genetic or other congenital abnormalities before conception or birth. Imposing liability on individual phy-

sicians or other health-care providers, these courts say, vindicates the societal interest in reducing and preventing the incidence of such defects. (*E.g., Blake v. Cruz* (1984), 108 Idaho 253, 256, 698 P.2d 315, 318.) Other courts have expressed concern that refusing to recognize this cause of action would frustrate the fundamental policies of tort law: to compensate the victim; to deter negligence; and to encourage due care. (*E.g., Robak v. United States* (7th Cir. 1981), 658 F.2d 471, 476 (applying Alabama law); *Phillips v. United States* (D.S.C. 1981), 508 F. Supp. 544, 550 (applying South Carolina law); *Gildiner v. Thomas Jefferson University Hospital* (E.D. Pa. 1978), 451 F. Supp. 692, 696 (applying Pennsylvania law); *Smith v. Cote* (1986), 128 N.H. 231, 243, 513 A.2d 341, 348.) A few courts have also stated that refusal to recognize wrongful birth claims would impermissibly burden the constitutional rights involved in conception, procreation, and other familial decisions. *E.g., Speck v. Finegold* (1981), 497 Pa. 77, 84-85, 439 A.2d 110, 114; *Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 846, 848.

Although the arguments of the defendants set out above are compelling, the great weight of authority to the contrary forces us to agree with the majority of the courts and the legal commentators and to hold that an action for the wrongful birth of a genetically or congenitally defective child may be maintained by the parents of such child.

We must next decide what elements of damages may be recovered by the parents. While the jurisdictions that have reached the merits of the wrongful birth controversy are almost unanimous in their recognition of the cause of action, they are not in agreement on how to assess damages. The complex legal, moral, philosophical, and social issues raised by wrongful birth claims have resulted in a widely divergent judicial treatment of dam-

ages. See Collins, *An Overview and Analysis: Prenatal Torts, Preconception Torts, Wrongful Life, Wrongful Death, and Wrongful Birth: Time For a New Framework*, 22 J. Fam. L. 677, 690-700 (1983-84); Rogers, *Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing*, 33 S.C.L. Rev. 713, 739-52 (1982); Trotzig, *The Defective Child and the Actions for Wrongful Life and Wrongful Birth*, 14 Fam. L.Q. 15, 33-37 (1980); see generally Note, *Damages: Recovery of Damages in Actions for Wrongful Birth, Wrongful Life and Wrongful Conception*, 23 Washburn L.J. 309 (1984).

The general rule of damages in a tort action is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated. Remote, contingent, or speculative damages do not fall within this general rule. (See D. Dobbs, Remedies sec. 3.1 (1973); C. McCormick, Damages sec. 137 (1935).) However, "few if any jurisdictions appear ready to apply this traditional rule of damages with full vigor in wrongful birth cases." *Azzolino v. Dingfelder* (1985), 315 N.C. 103, 112, 337 S.E.2d 528, 534.

Most courts which have recognized a cause of action in the parents for wrongful birth have found a breach of duty by the physician in depriving the parents of the opportunity to accept or to reject the continuance of the pregnancy. The damages that are generally allowed are those which the courts found flow from this breach of duty, that is, only the extraordinary expenses that are attendant to the care and treatment of the afflicted child, and do not include the expenses associated with the raising of a normal, healthy child. (See, *e.g., Moores*

*v. Lucas* (Fla. App. 1981), 405 So. 2d 1022; *Schroeder v. Perkel* (1981), 87 N.J. 52, 432 A.2d 834; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 386 N.E.2d 807; *Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 846; *Naccash v. Burger* (Va. 1982), 290 S.E.2d 825; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 233 N.W.2d 372.) Some courts have also permitted parents to recover in their wrongful birth action the extraordinary costs incurred as a result of the child's affliction *after* the child has reached the age of majority. These courts reason that, under the common law, where a child is incapable of supporting himself because of physical or emotional disabilities, the parents' obligation to support continues beyond the child's age of majority. See *Phillips v. United States* (D.S.C. 1983), 575 F. Supp. 1309, 1317 (applying South Carolina law); *Blake v. Cruz* (1984), 108 Idaho 253, 258-59, 698 P.2d 315, 320-21; *Smith v. Cote* (1986), 128 N.H. 231, 245, 513 A.2d 341, 350; *James G. v. Caserta* (W. Va. 1985), 332 S.E.2d 872, 882-83.

Although the question of damages has presented a difficult and troublesome problem to those courts which have considered wrongful birth claims, we align ourselves with the majority of jurisdictions which have limited the parents' recovery of damages to the extraordinary expenses—medical, hospital, institutional, educational and otherwise—which are necessary to properly manage and treat the congenital or genetic disorder. We emphasize that the plaintiffs here seek to recover only those extraordinary expenses that will be incurred *prior* to the child's reaching his majority.

Part III. Parents' Claim for Emotional Distress

In addition to seeking compensation for the extraordinary expenses they will sustain in managing and treating Adam's hemophilia, the Siemieniecs ask for damages for their emotional distress, which they claim are a natu-

ral and foreseeable consequence of the injury they sustained, and hence should be included as an essential element in the calculation of damages.

This court has recently reexamined its position with regard to recovery for emotional distress. (See *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546.) In that case, this court abandoned its previous adherence to the so-called "impact" rule and adopted what is referred to as the zone-of-danger rule. As stated in *Rickey*, this rule holds:

> "Basically, under [the zone-of-danger rule] a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress. This rule does not require that the bystander suffer a physical impact or injury at the time of the negligent act, but it does require that he must have been in such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact. The bystander, as stated, must show physical injury or illness as a result of the emotional distress caused by the defendant's negligence. (*Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 555.)

Thus, under the holding of *Rickey*, before a plaintiff can recover for negligently caused emotional distress, he must have, himself, been endangered by the negligence, and he must have suffered physical injury or illness as a result of the emotional distress caused by the defendant's negligence.

There are no allegations in the complaint from which it can be said that the defendants' alleged negligence in any way endangered the parents of the impaired child. It is also not alleged that the parents have or will suffer any physical injury or illness resulting from the emotional distress allegedly caused by defendants' negligence. The appellate court in this case applied the

*Rickey* test and held that absent allegations and proof of an intentional and outrageous conduct (see *Knierim v. Izzo* (1961), 22 Ill. 2d 73), or that the parents were at high risk to themselves which resulted in their physical injury or illness by reason of emotional distress caused by defendants' negligence, they have no cause of action for emotional distress damages. (134 Ill. App. 3d 823, 831.) The Siemieniecs acknowledge the limitation of the *Rickey* holding, but urge us to expand that holding to allow recovery here as a step in the continuing "development of emotional distress tort law in Illinois." In *Rickey*, this court thoroughly analyzed the law in relation to negligently inflicted emotional distress. After doing so, this court changed its previous adherence to the impact rule and adopted what it perceived as the standard applied in a majority of the jurisdictions where the question has been examined. (*Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 555.) *Rickey* thus brought the law of this State on the issue in question into conformity with the majority position. The Siemieniecs, however, provided us with no reason to further expand the right to recover for negligently inflicted emotional distress.

For the foregoing reasons, the judgment of the appellate court holding that Adam Siemieniec has a cause of action on his own behalf for the extraordinary expenses he will incur in managing and treating his hemophilic condition after he reaches majority is reversed, and upon remand to the circuit court of Cook County, the court is instructed to dismiss this claim for relief. The appellate court's judgment holding that Thomas and Janice Siemieniec have a cause of action for the extraordinary expenses they will incur in managing and treating Adam's hemophilic condition during his minority is affirmed. The appellate court's judgment holding that Thomas and Janice Siemieniec have no cause of action for the emo-

tional distress negligently inflicted by the defendants is affirmed. The cause is remanded to the circuit court of Cook County for further proceedings consistent with the holdings of this opinion.

*Appellate court affirmed in part and reversed in part; cause remanded, with directions.*

CHIEF JUSTICE CLARK took no part in the consideration or decision of this case.

JUSTICE GOLDENHERSH joins in Parts I and II and took no part in Part III of the decision.

JUSTICE WARD concurs as to Parts I and III and dissents as to Part II of the decision:

Adam, who is now six years old, was born a hemophiliac. As the majority states, the complaint of his parents is that because of the defendants' negligence in not correctly judging the chances of his being afflicted with hemophilia, Adam was born to them and not aborted, to his personal injury and to their financial and emotional injury. The majority follows the decisions in the majority of jurisdictions, including our own, and holds that Adam cannot recover on a wrongful life claim. The rationale in denying, as the majority recognizes, is that the core of the infant's claim is that, though the negligence of the defendants prevented the mother from obtaining an abortion which would have terminated the child's existence, human life, though burdened with injury, is as a matter of law always preferable to nonexistence. A second basis for rejecting the claim for wrongful life is the difficulty or impossibility of determining damages. There is no station from which one can compare the condition of life with handicaps, with a state of nonexistence. Who can judge that no life at all is better than a life that is impaired.

Having rejected the claim of Adam for "wrongful life," the majority then proceeds inconsistently, I consider, and expediently to hold that the parents have a cause of action for "wrongful birth." The majority accepts the allegation of Mrs. Siemieniec that had she been accurately advised of the risk that her conceived child would be born a hemophiliac, she then would have terminated the pregnancy by abortion. The parents contend that they were tortiously injured because Mrs. Siemieniec was deprived of the option of making an informed decision either to abort the existing fetus or to give birth to what was potentially a genetically defective child. The majority states that "in essence, they [the parents] claim that Adam's birth was wrongful"—that it would have been better for them had Adam never been born. In terms of seeking recovery in tort, Adam's being born was the resulting injury. I agree with the defendants' contention that the claim for a cause of action for wrongful birth is postulated on the assumption that life itself is an injury. The Supreme Court of North Carolina, in rejecting a claim of parents for wrongful birth, correctly observed that in order to allow recovery for wrongful birth a court must hold "that the existence of a human life can constitute an injury cognizable at law." *Azzolino v. Dingfelder* (1985), 315 N.C. 103, 337 S.E.2d 528, 533-34.

In the parents' claim of a cause of action, as in Adam's claim, we are weighing life against nonlife. The parents, too, say in effect that nonlife would have been a value and that life is an injury. I see only expediency to explain the holding for the parents.

In *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, this court considered claims of medical negligence based on "wrongful pregnancy" and held that the costs of rearing a normal child cannot be considered damages to the parents. I wrote for the court in that case and be-

lieve that the defendants may correctly cite it for the principle that holding that the birth of a child is a compensable injury offends fundamental values our civilization and culture attach to human life. What this court said in *Cockrum* earlier applies to today's holding of the majority that Adam's being born gave rise to a right of the parents to recover damages:

> "One can, of course, in mechanical logic reach a different conclusion, but only on the ground that human life and the state of parenthood are compensable losses. In a proper hierarchy of values the benefit of life should not be outweighed by the expense of supporting it. Respect for life and the rights proceeding from it are at the heart of our legal system and, broader still, our civilization." 95 Ill. 2d 193, 200-01.

One cannot pass over how painful to parents and child alike an action by parents must be. Parents will show that they did not want the child in his condition and that he would have been aborted had it not been for the professional inattentiveness of a physician or other medical person. Had they known, he never would have been. It is public policy obviously to encourage love and harmony in family relationships. Public policy which in importance transcends individual disputes will hardly be served by lawsuits of this character.

Circumstances in cases like these are tragic, but for the reasons given I must respectfully dissent from the majority's holding in Part II that the parents can recover for wrongful birth. I concur, however, in the disposition by the majority in Parts I and III.

JUSTICE MILLER specially concurs as to Parts I and II and joins in Part III of the decision:

I concur in the decision of the court. As the main opinion demonstrates, the minor's "wrongful life" action seeking special damages must fail because he cannot es-

tablish a legally cognizable injury. I agree with the decision that the minor's parents here suffered a legally cognizable injury and therefore should be allowed to pursue their "wrongful birth" action to recover the extraordinary expenses associated with their child's ailment, but that the parents' separate claim for damages for the negligent infliction of emotional distress is insufficient under *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546.

Because the parties' contentions in this appeal are adequately answered under those principles of tort law, I do not believe that it is necessary, or even helpful, to introduce the abortion controversy into the proceedings here. I therefore see no reason to rely on the Illinois Abortion Law of 1975 (Ill. Rev. Stat. 1985, ch. 38, pars. 81—21 through 81—35) or to attempt to discover a "pro-life" character to any of the prior decisions of this court in deciding the issues here.

For these reasons, I do not join in that portion of the opinion that looks to the Abortion Law as a source of public policy in this case, nor do I join in attempting to categorize any of the prior decisions of this court as "pro-life" or "pro-choice." An analysis of the opinion demonstrates that neither inquiry is necessary to a resolution of the issues presented here.

JUSTICE SIMON specially concurs as to Part II and dissents as to Parts I and III of the decision:

I agree with the conclusion reached in Part II of the majority opinion that the parents may maintain an action for wrongful birth. I do not subscribe, however, to the majority's baffling statements characterizing the defendants' arguments opposing recognition of the wrongful birth tort as "compelling" and saying that the only reason for the decision is that "the great weight of authority to the contrary forces us to agree with the ma-

jority of courts and the legal commentators" (117 Ill. 2d at 258). Obviously, the decisions of courts of other jurisdictions may persuade but cannot coerce us, and this court would abdicate its solemn duty if we merely deferred to the wisdom of other judges. As I see it, there is no basis for the quandary the majority perceives itself to be in—confronted by what it regards as compelling arguments on one side and the great weight of authority on the other. The wrongful birth action involves classic malpractice: the doctor's negligence deprives the parents of their ability to make an informed choice that they have a legal right to make, and, as a result, the parents sustain actual damages. This is the foundation for the decisions of other courts, and there is no reason why the majority should accept it so grudgingly, thereby conveying the impression that it would have preferred to reach the opposite result.

While I concur in the result reached in Part II, I believe that Parts I and III of the majority opinion are wholly in error. In Part I, the majority extends its holding in *Goldberg v. Ruskin* (1986), 113 Ill. 2d 482, to bar special damages as well as general damages for wrongful life. Although *Goldberg* strictly confined itself to the question of general damages, this extension was predictable because the court reasoned there that a child suffers no legally cognizable injury by being born. I continue to disagree for the reasons so eloquently and soundly stated by Chief Justice Clark in his dissenting opinion in *Goldberg*, by Justice Rizzi in his dissenting opinion in the appellate court in the same case (*Goldberg v. Ruskin* (1984), 128 Ill. App. 3d 1029, 1044 (Rizzi, P.J., dissenting)) and by Justice Hartman in his opinion for the appellate court in this case.

The court is not, however, content to rely on *Goldberg*, but instead insists on injecting as well a purported public policy contained in section 1 of the Illinois Abor-

tion Law of 1975 (Ill. Rev. Stat. 1985, ch. 38, par. 81—21). That statute does not, in my opinion, reflect any valid, subsisting policy of the State of Illinois. The act itself recognizes that the prohibition of abortion except when necessary to preserve the life of the mother is at best the "former policy" of the State (Ill. Rev. Stat. 1985, ch. 38, par. 81—21) and that the United States Constitution, as interpreted by the Supreme Court in *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, has displaced this policy. The legislature's attempt to proclaim a once and (perhaps) future policy which is not and cannot be the current public policy is an exercise in futility. To my mind the legislature has no authority to enact statements of reversionary policy, which, of course, would not bind future legislatures.

The majority's emphasis on a sentence in the statute announcing that the unborn child is, from the time of conception, a "human being *** [and] therefore, a legal person for purposes of the *** right to life" is also misplaced. In *Akron v. Akron Center for Reproductive Health* (1983), 462 U.S. 416, 76 L. Ed. 2d 687, 103 S. Ct. 2481, a city ordinance required physicians to obtain the "informed consent" of all women seeking abortions by telling them, *inter alia*, that "the unborn child is a human life from the moment of conception." The Supreme Court struck down the requirement because it was "inconsistent with the Court's holding in *Roe v. Wade* that a State may not adopt one theory of when life begins to justify its regulation of abortions." (462 U.S. 416, 444, 76 L. Ed. 2d 687, 712, 103 S. Ct. 2481, 2500.) The Illinois Abortion Law suffers the same defect. The majority apparently believes that the declaration that the unborn child is a legal person can be wrenched from its context and properly used as a reason to reject the tort of wrongful life, but this ignores the explicit language of the provision which states that the fetus is a legal per-

son "for purposes of the \*\*\* right to life." Since the pronouncement is ineffectual with respect to the subject explicitly addressed—abortion—I do not see how it can have greater impact on the independent question of the tort of wrongful life. Contrary to the majority opinion, the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2), precludes any all-encompassing State policy "favoring childbirth over abortion" (117 Ill. 2d at 249), and thus the court cannot properly justify its decision by reference to the Illinois Abortion Law.

Reliance on the Illinois Abortion Law to deny a cause of action for wrongful life is disingenuous since the argument has equal force with respect to the parents' claim for wrongful birth, which the majority sustains. The majority offers no distinction, simply failing to explain why the Illinois Abortion Law is relevant to bar a suit for wrongful life but not wrongful birth. The gravamen of the injury under the majority's wrongful birth theory is that the defendants negligently deprived the parents of the opportunity to choose abortion. But if our public policy is truly "pro-life," why should we allow a cause of action for this brand of medical practice? Under the majority's reading of our public policy, we should instead pat the defendant doctors on the back for their work in frustrating a choice of abortion. The fact is that no such public policy exists, and the Illinois Abortion Law has no more persuasive effect on the question of wrongful life than it does on wrongful birth.

Part III of the majority opinion refuses any recovery for the parents' emotional distress based on the zone-of-danger rule articulated in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546. The *Rickey* rule, formulated in the context of bystander cases, should not govern in situations like this one in which the parents are not bystanders either by chance or because of relationship, but the actual victims of the defendants' negli-

gence. The majority has in fact held that the parents are the *only* victims here. The majority says that the plaintiffs have afforded no reason to broaden *Rickey* to cases in which those suffering emotional distress are not threatened with physical impact. But neither has the majority advanced any suggestion as to why the general tort rule—that injuries proximately caused by the negligent conduct of one who has a duty to the victim are compensable—should not apply here. The old "impact" rule and the more recent "zone-of-danger" rule are theories that have developed to keep the door from opening wide in instances where recovery is sought for injuries which are emotional and not physical.

In *Rickey* this court noted that opponents of recovery for emotional distress justify guarding the door by pointing to the possibility of fraudulent or frivolous litigation, the difficulty of measuring damages, and the supposition that emotional injuries are not foreseeable. (98 Ill. 2d 546, 555.) Whatever force these considerations may have in the typical hit-and-run or accidental injury case, they are irrelevant here. There can be little danger of fraudulent or frivolous claims that a physician failed to adequately investigate or advise parents of the risk that their child would be born with a serious congenital illness. And I think it is patently foreseeable that birth of a child so afflicted, after the parents based the decision not to abort on the doctor's inaccurate assurance that the risk was very low, could result in emotional trauma to the parents. The measurement of damages for this type of emotional distress is no more difficult than in cases where the emotional distress has been intentionally inflicted or negligently inflicted on a person within the zone of physical danger. In both of the latter situations, the law of this State permits recovery. (*Knierim v. Izzo* (1961), 22 Ill. 2d 73; *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546.) "[C]ourts have come to recog-

nize that mental and emotional distress is just as 'real' as physical pain, and that its valuation is no more difficult" (*Berman v. Allen* (1979), 80 N.J. 421, 433, 404 A.2d 8, 15) and have therefore permitted parents to recover for emotional distress caused by wrongful birth (80 N.J. 421, 404 A.2d 8; *Naccash v. Burger* (1982), 223 Va. 406, 290 S.E.2d 825; *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483). The focus should be on injuries directly flowing from the defendants' negligence, and I see no reason to apply the artificial *Rickey* limitation in these circumstances instead of allowing the plaintiffs to prove emotional distress.