Kimberly A. MOLLOY, et al., Respondents,

v.

Diane M. MEIER, M.D., et al., Appellants (C9–02–1821), Respondents (C2–02–1837),

Reno E. Backus, M.D., et al., Defendants (C9–02–1821), Appellants (C2–02–1837),

North Memorial Health Care d/b/a North Memorial Medical Center, Defendant (C2–02–1837).

Nos. C9–02–1821, C2–02–1837.

Court of Appeals of Minnesota.

May 6, 2003.

apolis, MN, for respondents Kimberly Molloy, et al.

Katherine A. McBride, Barbara A. Zurek, William M. Hart, Meagher & Geer, P.L.L.P., Minneapolis, MN, for appellants and respondents Diane Meier, et al.

David D. Alsop, Laura L. Myslis, Matthew P. Kostolnik, Gislason & Hunter LLP, Minnetonka, MN, for appellants Reno Backus, et al.

Considered and decided by WILLIS, Presiding Judge, SCHUMACHER, Judge, and G. BARRY ANDERSON, Judge.

## OPINION

G. BARRY ANDERSON, Judge.

Appellants challenge the district court's denial of their summary-judgment motions and the district court's decisions regarding three certified questions. We affirm the district court's conclusions on all three issues. First, a physician-patient relationship existed here between appellants and respondent Kimberly Molloy because the physicians had a duty to inform Molloy of the existence of a genetic condition. Second, Kimberly Molloy's cause of action accrued at the point of conception of M.M., and thus, it is not time-barred under Minnesota law. Finally, Minnesota law does not bar Kimberly Molloy's cause of action because it is not a suit alleging that had appellants' negligence not occurred, an abortion would have been sought.

## FACTS

This is a medical-malpractice action involving a child born to respondents Kimberly and Glenn Molloy. Their child, M.M., was born in 1998 with fragile X syndrome, a hereditary condition that causes a range of mental impairments, from mild learning disabilities to severe

Terry L. Wade, Wendy J. Zeller, Robins, Kaplan, Miller & Ciresi L.L.P., Minne-

mental retardation.[1] Soon after discovering that M.M. had fragile X syndrome, respondents learned that Kimberly Molloy's daughter from a prior marriage, S.F., also had fragile X and that Kimberly Molloy is a carrier of fragile X.

S.F. was born March 9, 1988, to Kimberly Molloy and her former husband Robert Flomer. Molloy and Flomer also had two other daughters. Molloy and Flomer divorced when S.F. was approximately one-and-a-half years old. Flomer was awarded custody of all three children. Kimberly subsequently married respondent Glenn Molloy and had two children, K.M. and M.M., who were born in 1993 and 1998, respectively.

On May 18, 1992, Kimberly Molloy consulted with Dr. Diane Meier to determine the source of S.F.'s developmental abnormalities. Molloy told Dr. Meier that Molloy had a brother with mental retardation, and she expressed a desire to determine whether S.F.'s problems might be genetic. In the notes for that exam, Dr. Meier wrote "? Chromosomes plus Fragile X" and ordered chromosomal testing of S.F. Dr. Meier advised Molloy that if S.F.'s tests were abnormal, Molloy would need to return for testing. Molloy assumed that if testing were required, Dr. Meier would order it. Dr. Meier also referred S.F. to Dr. Reno Backus at the Minneapolis Clinic of Neurology.

On June 23, 1992, Molloy, along with Robert Flomer and his new spouse, Randine Flomer, brought S.F. to Dr. Backus and told him about Molloy's brother. Dr. Backus diagnosed S.F. as developmentally delayed with autistic tendencies of unknown etiology. Molloy told Dr. Backus

that she had remarried and asked him about the risk that she might give birth to another child with problems like those suffered by S.F. Dr. Backus told Molloy that the chances she would have another child like S.F. were extremely remote, especially with a father other than Robert Flomer. Dr. Backus told Molloy that S.F.'s problems were not genetic but were "just one of those things that happen."[2] S.F. had only this one appointment with Dr. Backus and neither the Flomers nor Molloy saw Dr. Backus again. Dr. Backus testified that he was not involved with S.F.'s care but that his role was to evaluate her from a neurological point of view and that he was merely acting as an adviser to Dr. Meier, the referring physician.

Approximately one month later, Randine Flomer brought S.F. to North Memorial Medical Center for the chromosomal testing that Dr. Meier ordered. Although Dr. Meier admitted that it was her intention to order fragile X testing, for unknown reasons, this test was not performed. The tests that were done did not reveal any chromosomal abnormalities, and Dr. Meier related those test results to the Flomers over the phone. The results were also relayed to Molloy, who believed that the normal test results included fragile X testing.

On December 14, 1992, Dr. Meier saw the Flomers for a consultation with S.F. In her notes about this visit, Dr. Meier wrote, "check fragile X (if done 6/92)." Dr. Meier did not determine at this time whether S.F. had been tested for fragile X. S.F. treated at Oakdale Pediatrics with Dr. Meier until December 19, 1995, when her

---

1. A person with fragile X syndrome has a mutation of the FMR1 (fragile X mental retardation 1) gene in the DNA that makes up the X chromosome.

2. Molloy recalls Backus stating that the chances of a condition similar to that suffered by S.F. occurring again were no higher than one in several hundred thousand and possibly even more remote.

father switched her to a different primary-care physician, Dr. Marilyn Campbell, at Columbia Park Medical Clinic.

Dr. Campbell referred S.F. to Dr. Kathryn Green, a pediatric neurologist at the Minneapolis Clinic of Neurology. Dr. Green met with the Flomers, examined S.F., and reviewed S.F.'s diagnostic history, including the chromosomal testing ordered by Dr. Meier. Dr. Green also reviewed S.F.'s family history and noted a maternal half-uncle with mental retardation. Dr. Green never met with or spoke to Kimberly Molloy. Dr. Green did not order or recommend fragile X testing. Dr. Green testified that she was not asked by Dr. Campbell to make a diagnosis of S.F., but rather to give an opinion of how to manage S.F.'s hyperactivity, and therefore prescribed Clonidine to replace the Ritalin that S.F. had been taking. The Flomers never returned to visit Dr. Green.

Kimberly Molloy became pregnant in September 1997, and, on June 30, 1998, she gave birth to M.M. After M.M. began showing signs of developmental delay, but before M.M. or S.F. were diagnosed with fragile X, Molloy underwent surgical sterilization because of concerns that she was a carrier of genetic defects. In June 2000, M.M. was diagnosed as suffering from fragile X syndrome; subsequent testing established that S.F. also has fragile X syndrome. Kimberly Molloy was tested, and it was determined that she is a carrier of fragile X.

Respondents initiated this lawsuit on August 23, 2001, alleging that Drs. Meier, Backus, and Green and their employers were negligent in the care and treatment rendered to S.F., Kimberly Molloy, and Glenn Molloy by failing to order fragile X testing on S.F., failing to read and interpret the laboratory results from the test that S.F. underwent, negligently reporting to S.F.'s parents that S.F. had been tested

for fragile X and that she did not have that condition, and failing to counsel respondents regarding their risks of passing an inheritable genetic abnormality to future children. Respondents allege that had they known of S.F.'s condition, they would not have conceived M.M. and that, as a result of appellants' negligence, they have incurred and will continue to incur medical, educational, and other expenses relating to M.M.

Appellants brought motions for summary judgment, subsequently denied by the district court. Appellants then brought a motion to certify the issues presented by their summary-judgment motions as important and doubtful for the purpose of bringing an appeal pursuant to Minn. R. Civ.App. P. 103.03(i). The district court granted appellants' motion on September 30, 2002, and certified four issues. By order, this court consolidated the two appeals on October 25, 2002. In a separate order, this court dismissed certified question number four pertaining to damages because the district court did not rule on this issue and it did not appear that the issue was relevant to appellants' motion for summary judgment.

## ISSUES

I. Does a physician who fails to test for and diagnose a genetic disorder in a child owe a legal duty to that child's parents who have a subsequent child that also has that disorder?

II. When does a cause of action accrue in a medical malpractice claim alleging failure to test for and diagnose a genetic disorder in a child, when a subsequent child was born with the same disorder?

III. Does Minn.Stat. § 145.424 (2002) prohibit parents from bringing an

action alleging they would not have conceived the subsequent child described in question II?

## ANALYSIS

■ When certified questions arise from a denial of summary judgment, the summary judgment standard applies; therefore, we review the record to resolve "whether there are any genuine issues of material fact and whether the lower courts erred in their application of the law." *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn.1998). On appeal, we "must view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993) (citation omitted).

■ The main issues here are whether appellants had a legal duty to respondents and whether the district court erred in its interpretation of various statutes. Whether a legal duty exists is generally a question of law for the court to determine. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985). In addition, statutory construction is a question of law, which this court reviews de novo. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998).

### I

■ The first question in a negligence claim based on medical malpractice is whether a physician-patient relationship existed. *Peterson v. St. Cloud Hosp.*, 460 N.W.2d 635, 638 (Minn.App.1990). The ex-

istence of such a relationship is a prerequisite for finding that the defendant doctor owed a duty to the plaintiff. *McElwain v. Van Beek*, 447 N.W.2d 442, 445 (Minn.App. 1989), *review denied* (Minn. Dec. 20, 1989).[3]

Here there is no dispute that appellants had a duty to S.F., their patient. At issue is whether the doctors also had a duty to S.F. and M.M.'s mother, Kimberly Molloy, and her husband, Glenn Molloy, M.M.'s father. The district court concluded that a duty might extend to Kimberly Molloy because a "doctor performing genetic tests on a minor child owes a duty to the biological parents of the child."

A duty to a third party who is not a patient of the physician has been recognized in only a few Minnesota cases. In "duty-to-warn" cases, a duty has been recognized where the physician's patient poses a danger of harm to an identifiable third person.[4] *Id.* The Minnesota Supreme Court has limited a physician's duty to warn to circumstances where the patient makes specific threats against identifiable third parties. *Id.*

■ Physicians have also been found to have a "duty to control" their patients when they pose a threat to third parties. *Id.* The duty to control a patient exists only when the physician has the ability to control the patient and the harm is foreseeable. *Lundgren v. Fultz*, 354 N.W.2d 25, 28 (Minn.1984).

The facts here are not comparable with either the duty-to-warn or the duty-to-control cases. S.F.'s treatment did not

---

3. Once a plaintiff can show that a duty exists, a prima facie case of medical malpractice consists of showing: (1) the standard of care applicable, (2) that the physician departed from that standard, and (3) that such departure caused the plaintiff's injuries. *McElwain v. Van Beek*, 447 N.W.2d 442, 445 (Minn.App. 1989), *review denied* (Minn. Dec. 20, 1989).

4. This line of cases follows the well known California decision, *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), where a psychiatric patient had confided to his therapist his intention to kill Tarasoff. The psychiatrist was found to have a duty to warn of the dangerousness of the patient. *Id.* at 343.

pose a danger to third persons. Her condition did not create a duty on the part of appellants to control S.F. or a duty to warn others that they were in imminent danger.

In a third category of cases, a duty has been found between a physician and a minor patient's parents. *Skillings v. Allen,* 143 Minn. 323, 173 N.W. 663 (1919). In *Skillings,* a physician advised the parents of a minor child that they could safely visit their child, who was in the hospital with scarlet fever. *Id.* at 324, 173 N.W. at 663. After both parents contracted scarlet fever, the parents asserted a cause of action against the physician. *Id.* The supreme court held that the physician was liable for negligently advising the parents:

> To advise them that they ran no risk in visiting her at the hospital or in taking her into their home necessarily exposed them to danger if they acted on the advice, and defendant was bound to know that they would be likely to follow his advice.

*Id.* at 326, 173 N.W. at 664.

Appellants argue that *Skillings* is distinguishable from the present facts because no communicable disease is present. The supreme court has stated that the decision in *Skillings* was based upon the contractual relationship between the parents and the physician, as well as the special treat-ment accorded infectious diseases. *McElwain,* 447 N.W.2d at 446.

■ Although no communicable disease is present here, *Skillings* nonetheless guides our analysis. As in *Skillings,* though there is evidence in the record that Kimberly Molloy received and relied upon direct advice from appellants. Molloy told Dr. Meier about Molloy's brother, who suffers from mental retardation, and asked Dr. Meier to perform tests to determine whether S.F. had inherited any genetic abnormality from her. Dr. Meier specifically made a notation to test for fragile X and told Molloy that if an abnormality was detected, then Molloy would need to be tested also.

■ While no Minnesota case has addressed whether physicians owe a legal duty to parents in these circumstances, other states have found a duty to exist.[5] Further, negligence law establishes the scope of a defendant's duty based on the reasonable foreseeability of the consequences of an individual's actions. *See Tomfohr v. Mayo Found.,* 450 N.W.2d 121, 124–25 (Minn.1990) (a custodian of another person may be liable for consequences of harm to that person inflicted by a third person when that harm is reasonably foreseeable); *Oslin v. State,* 543 N.W.2d 408, 415 (Minn.App.1996) (holding that if an

---

5. *See, e.g., Lininger v. Eisenbaum,* 764 P.2d 1202 (Colo.1988) (claim that doctors breached duty to parents in failing to diagnose congenital amaurosis, a hereditary form of blindness, in first child held viable even though parents not patients); *Pate v. Threlkel,* 661 So.2d 278 (Fla.1995) (permitting a child to sue parent's physician for failing to warn child that parent had medullary thyroid carcinoma, a genetically transferable condition); *Siemieniec v. Lutheran Gen. Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987) (allowing parents of child born with hemophilia to bring cause of action against hospital for expenses of raising child); *Nelson v. Kru-*sen, 678 S.W.2d 918 (Tex.1984) (erroneously interpreting a woman's carrier status test for Duchenne muscular dystrophy as negative); *Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (1982) (allowing a cause of action when a doctor erroneously informed a father that he was not a carrier of Tay–Sachs). *See also,* Jeffrey W. Burnett, *A Physician's Duty to Warn a Patient's Relatives of a Patient's Genetically Inheritable Disease,* 36 Hous. L.Rev. 559, 569–575 (1999); Lori B. Andrews, *Torts and the Double Helix: Malpractice Liability for Failure to Warn of Genetic Risks,* 29 Hous. L.Rev. 149, 153–155, n. 17, 18 (1992).

event is reasonably foreseeable, duty to act may exist as a matter of law). The damage here resulting from the alleged negligent actions was foreseeable. Appellants should have foreseen that negligently rendering care to S.F. or erroneously reporting genetic test results to S.F.'s biological parents could result in the birth of another child with fragile X.[6] If an additional child were born with this genetic abnormality, it is also foreseeable that respondents would sustain certain damages in the form of medical or other expenses. Finally, appellants could reasonably foresee that a parent of childbearing years, such as Kimberly Molloy, might, in the absence of knowledge that S.F. suffered from a genetically transferable condition, conceive another child.

The genetic testing Dr. Meier and Molloy discussed was not ordered to benefit S.F. Molloy was asking Dr. Meier to determine whether she was a carrier for a genetic abnormality suffered by her child. Because fragile X is neither curable nor treatable, the testing was undertaken for the benefit of others, here specifically Kimberly Molloy. The testing is important because genetic-disease-carrier status and the likelihood of future genetic defects are important factors in family-planning decisions.[7] Dr. Meier also admitted in her deposition that when a genetic abnormality is discovered in a child, the biological parents should always be notified. This evidence indicates that Dr. Meier appreciated that a duty exists to advise biological parents of genetic test results and that she assumed a duty to appropriately test S.F. for genetic abnormalities and to report back to Molloy if the tests indicated that Molloy is a carrier. Given that Dr. Meier undertook to advise Molloy on these genetic issues, we conclude that Dr. Meier had a duty to advise Molloy pursuant to the appropriate standard of care.

■ Similarly, Molloy specifically asked Dr. Backus about the risk that she might give birth to another child with S.F.'s problems. Dr. Backus advised her that the risk was extremely remote, especially with a father other than Robert Flomer. We recognize that at the time that he saw Molloy, Dr. Backus erroneously believed that Dr. Meier's testing had included fragile X testing or that she was planning to do it. Respondents allege, however, that Dr. Backus, after entering into a relationship in which a duty existed to Molloy to render correct and appropriate medical advice, should have known that Dr. Meier had failed to properly complete the chro-

6. In *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981), the New Jersey Supreme Court found a physician-patient relationship in circumstances very similar to these facts. The defendant doctors in that case failed to diagnose genetically transmitted cystic fibrosis in a child. *Id.* at 836. Before learning that the child had cystic fibrosis, Schroeder became pregnant, and, one month after learning of the first child's diagnosis, Schroeder gave birth to a second child who also had cystic fibrosis. *Id.* The New Jersey Supreme Court held that the defendants' duty "may extend beyond the interests of a patient to members of the immediate family * * * who may be adversely affected by a breach of that duty." *Id.* at 839. The court stated that the defendants should have foreseen that parents of childbearing years, like the Schroeders, would, in the absence of the cystic-fibrosis diagnosis, conceive another child. *Id.* While we recognize that *Schroeder* is not precedential, we find its treatment of the foreseeability of negligent care in the area of genetically transferable diseases persuasive.

7. It is worth noting that after M.M. was diagnosed as suffering from fragile X, the attending physician recommended genetic testing for other family members. When S.F. also tested positive for fragile X, the pediatric clinic at Hennepin Faculty Associates provided Molloy with genetic counseling for her and her other children and offered testing and counseling to all family members.

mosomal testing. Therefore, respondents allege, Dr. Backus was negligent in assuming that the fragile X test had been completed. Although for purposes of this appeal we need not reach the merits of all of respondents' allegations, we conclude that the record supports a finding that Dr. Backus owed Molloy a duty to render medical advice pursuant to the appropriate standard of care when he advised her regarding the risks of conceiving another child with the same problems as S.F.

 Dr. Green argues that a physician-patient relationship cannot exist because Green never met respondents personally. But lack of direct contact "in itself does not preclude a physician-patient relationship." *Peterson,* 460 N.W.2d 635, 638 (holding that a consensual physician-patient relationship may exist even where others have contracted with the physician for the patient's benefit). In *Peterson,* the patient's treating doctor, Dr. Weitz, sent sample cells of Peterson's tumor to Dr. Murray to examine. *Id.* at 638. Concluding that Dr. Weitz contracted with Dr. Murray with the express or implied consent of Peterson, this court held that Peterson could sustain a claim against Dr. Murray, even though the two had never met. *Id.* at 638. Peterson and Dr. Murray were thus in a consensual physician-patient relationship because Dr. Murray rendered health-care services on behalf of Peterson and for Peterson's benefit. *Id.*

As in *Peterson,* S.F.'s treating physician, Dr. Campbell, retained Dr. Green to give an opinion as to managing S.F.'s hyperactivity. Dr. Green's treatment, and subsequent failure to order fragile X testing, were thus rendered for the benefit of S.F., and, under *Peterson,* a physician-patient relationship existed between Dr. Green and S.F.

Dr. Green, like Drs. Meier and Backus, conceded that physicians are expected to notify family members when a genetic abnormality is detected so that those family members may obtain testing too, if desired. As in *Peterson,* a consensual relationship existed between Dr. Green and Molloy because both knew that health-care services were being rendered on behalf of S.F. and that there was an expectation that information would be forwarded to Molloy as one of S.F.'s biological parents.

 Appellants also argue that if a duty is found here, a physician might be liable for seeking out and informing distant relatives and unknown persons to notify them of the patient's genetic abnormality. The duty we find here is not this complex. If the patient is an adult, the duty to diagnose a genetic disease ends with the communication to the patient. With a patient such as S.F., who is a minor, the physician must notify a biological parent. Thus, appellants' duty would have been satisfied had they rendered appropriate medical services to S.F. and correctly communicated the resulting information to a biological parent of S.F. This they did not do.

 This duty does not extend, however, to Molloy's husband, Glenn Molloy. He is not a biological parent of S.F. and is not entitled to receive medical information regarding S.F.'s medical history, genetic or otherwise. Furthermore, he was not present at any of the appointments with appellant doctors. On this record, no physician-patient relationship exists between Glenn Molloy and appellants, and there was no duty on the part of appellants to convey medical information regarding S.F. to Glenn Molloy.

II

The legislature has established a four-year limitations period for medical-malpractice claims. Minn.Stat. § 541.076(b)

(2002). The statute was made effective August 1, 1999, and applies to "actions commenced on or after that date." Act of Mar. 26, 1999, ch. 23, §§ 1–3, 1999 Minn. Laws 128, 128, codified at Minn.Stat. § 541.076. Therefore the statute acts retroactively to revive claims that had expired under the previous two-year statute and before the effective date of the new statute. Minn.Stat. § 541.076(b); *see Gomon v. Northland Family Physicians, Ltd.,* 645 N.W.2d 413, 419–20 (Minn.2002) (holding that the new statute of limitations "applies to all claims that are within the four-year limitations period and commenced on or after the effective date of the new statute"). Because respondents commenced this suit in August 2001, the four-year statute of limitations applies and the material question is when the cause of action accrued and the statute of limitations began to run.

Appellants argue that the district court erred by concluding that the statute of limitations began to run at the conception of M.M. and not at the termination of treatment of S.F. by each individual doctor.

■■■ Generally, in tort cases the cause of action accrues at the time of injury, which usually coincides with the act causing injury. *Dalton v. Dow Chem. Co.,* 280 Minn. 147, 151, 158 N.W.2d 580, 583 (1968); *Peterson,* 460 N.W.2d at 638. In medical-malpractice cases, however, the manifestation of the injury can come years after the alleged negligent treatment or misdiagnosis. *See Fabio,* 504 N.W.2d at 762 (failure to diagnose breast cancer not discovered until more than two years after physician told plaintiff "not to worry"). Some jurisdictions have adopted a "discovery rule" tolling the running of the statute of limitations until the patient discovers or

should have discovered the injury. *See* David W. Feeder, II, *When Your Doctor Says, "You Have Nothing to Worry About," Don't Be So Sure: The Effect of Fabio v. Bellomo on Medical Malpractice Actions in Minnesota,* 78 Minn. L.Rev. 943, 954 n. 48 (1994) (listing a "vast majority of states" that recognize the discovery rule to some extent).

■■■ Minnesota courts have explicitly rejected this approach. *Johnson v. Winthrop Labs. Div. of Sterling Drug, Inc.,* 291 Minn. 145, 149, 190 N.W.2d 77, 81 (1971). Thus, the statute of limitations in Minnesota "for medical malpractice may bar a cause of action before the injured party discovers they are suffering damages caused by negligent medical conduct." *Zagaros v. Erickson,* 558 N.W.2d 516, 521 (Minn.App.1997), *review denied* (Minn. Apr. 17, 1997). The legislature has chosen not to enact a discovery rule for medical-malpractice cases.

■■■ There are two exceptions that suspend, or toll, the running of the statute of limitations: first, "fraudulent concealment" by a physician tolls the running of the statute of limitations. *Schmucking v. Mayo,* 183 Minn. 37, 40–41, 235 N.W. 633, 634 (1931). Fraudulent concealment has not been asserted here. In the exception relevant here, courts have adopted the termination-of-treatment rule, which states that a cause of action generally accrues when treatment for a particular condition ceases. *Fabio,* 504 N.W.2d at 762. The purpose of the termination-of-treatment rule is to encourage the patient's reliance on the physician during the course of treatment because the relationship can potentially preclude the patient from discovering acts or omissions that could constitute malpractice. *Zagaros,* 558 N.W.2d at 520 (citation omitted).[8]

8. In an exception to the termination-of-treat- ment rule, the single-act exception holds that

Appellants argue the termination-of-treatment rule should be applied because the facts here are similar to misdiagnosis cases.[9] But these cases deal almost exclusively with litigation by the patient against his or her doctor where the misdiagnosis causes the plaintiff damage. For example, both *Fabio* and *Zagaros* dealt with conditions, cancer and BPD, that grow progressively worse without treatment. *See, e.g., Fabio,* 504 N.W.2d at 762 (failure to diagnose and treat breast cancer); *Zagaros,* 558 N.W.2d at 521–22 (misdiagnosis of borderline personality disorder or "BPD"). The negligence alleged here is unique in that the failure to order fragile X testing did not make S.F's condition progressively worse. Because the condition is neither curable nor treatable, the medical error did not directly damage the patient. Indeed, the negligence arguably never harmed S.F. at all. Thus, had respondents not conceived another child, the alleged negligence could not sustain a cause of action because respondents would have suffered no damage.

 The conclusion that respondents did not have a viable cause of action until M.M.'s conception is also consistent with the general rule that a cause of action does not accrue until damage has resulted. *Peterson,* 460 N.W.2d at 638. "Alleged negligence coupled with the alleged resulting damage is the gravamen in deciding the date when the cause of action accrues." *Id.* (citing *Offerdahl v. Univ. of Minn.*

*Hosp. & Clinics,* 426 N.W.2d 425, 429 (Minn.1988)). In *Peterson,* this court held that appellants did not suffer damage until Peterson received chemotherapy and radiation treatments due to a misdiagnosis of a lung lesion. *Id.* The court rejected the assertion by respondents that appellants were harmed at the time of the misdiagnosis because, under Minnesota law, appellants could not have brought a cause of action at that time. *See id.* at 639 (quoting *Langeland v. Farmers State Bank of Trimont,* 319 N.W.2d 26, 32 (Minn.1982)) (noting that appellants would not be able to assert a cause of action for the negligent infliction of emotional distress absent either physical injury or physical danger). Furthermore, the court noted that holding that appellants' cause of action accrued when Peterson began treatment was consistent with Minnesota's refusal to adopt the discovery rule. *Id.* Had Peterson never "proceeded with radiation and chemotherapy treatment, it is doubtful whether a cause of action on [the doctor's] alleged negligence would ever have accrued." *Id.* But because the *occurrence* of the damage, rather than discovery of it, determines when a medical-malpractice action accrues, the statute of limitations in the Peterson action commenced with Peterson's first treatment. *Id.*

 We find the present facts similar to *Peterson.* Respondents here allege that, had proper fragile X testing been done on S.F. and had the test results been

---

the cause of action accrues "at the time the plaintiff sustains damage from that act, absent fraudulent concealment," *Ciardelli v. Rindal,* 582 N.W.2d 910, 912 (Minn.1998), or "at the time of the negligent act." *Doyle v. Kuch,* 611 N.W.2d 28, 31 (Minn.App.2000). This "single-act exception" is not limited only to conduct that starts and stops in a moment but also is applicable to a course of malpractice that terminates at a specific point in time. *Haberle v. Buchwald,* 480 N.W.2d 351, 355–

56 (Minn.App.1992), review denied (Minn. Aug. 4, 1992).

9. Appellants assert that treatment ended with Dr. Meier in December 1995, with Dr. Backus on June 23, 1992, and with Dr. Green on April 30, 1996. It is undisputed that if the termination-of-treatment rule applies, respondents' action is barred because the litigation was not brought within four years after the termination of treatment.

accurately relayed, respondents would have known Kimberly Molloy was a carrier of the fragile X abnormality and would have undertaken steps to prevent future conception.

The analysis used by the supreme court in *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 175 (Minn.1977), is instructive here. The claim in *Sherlock* arose out of a failed vasectomy, and the supreme court concluded that the parents were not entitled to recover damages incident to pregnancy and birth until conception occurs. 260 N.W.2d at 176. It is difficult to articulate a principled distinction between *Sherlock* and our present facts. In both cases, absent conception, no claim exists. In both cases, damages originated with conception. Here, it is clear that no injury was sustained until M.M. was conceived.

Counsel for Dr. Meier, in a well-presented and thorough argument, claims that the effect of the district court holding, and our answer to this certified question, is to open the door to genetic-diagnosis claims without limit. And as the concurring opinion cogently argues, theoretically, a claim could be made years, or decades, after the failed diagnosis. Although the extent and number of these claims is rank speculation, as a matter of public policy, this argument has substantial merit. But it is the province of the legislature, not this court, to enact a statute of repose or to take other action to limit the risk to physicians, if that is the desired outcome.

Because we hold that the cause of action did not accrue until the date of conception, approximately September 1997, we need not rely on the application of the termination-of-treatment rule or the single-act exception to that rule. Because the four-year statute of limitations had not run when respondents initiated the present suit in August 2001, it is not time-barred.

## III

The third certified question involves whether Minnesota law prohibits Kimberly Molloy's cause of action. The district court held that respondents asserted a permissible wrongful-conception cause of action and that Minn.Stat. § 145.424, subds. 1 and 2 (2002), were inapplicable. The interpretation and construction of a statute is a question of law that this court reviews de novo. *Lefto v. Hoggsbreath Enters., Inc.,* 581 N.W.2d 855, 856 (Minn. 1998).

Minnesota law prohibits certain causes of action in Minn.Stat. § 145.424:

> **Subdivision 1. Wrongful life action prohibited.** No person shall maintain a cause of action or receive an award of damages on behalf of that person based on the claim that but for the negligent conduct of another, the person would have been aborted.
>
> **Subd. 2. Wrongful birth action prohibited.** No person shall maintain a cause of action or receive an award of damages on the claim that but for the negligent conduct of another, a child would have been aborted.

Minn.Stat. § 145.424, subds. 1, 2.

Subdivision 1 is not applicable here. "Wrongful life" actions are brought by a child to recover damages for wrongfully being born. *Sherlock,* 260 N.W.2d at 172 n. 3. Because M.M. is not a party to this action, this is not a prohibited wrongful-life suit.

Appellants claim that respondents' suit is prohibited under subdivision 2 because it is for "wrongful birth." Respondents, however, characterize their cause of action as one for wrongful conception and therefore not prohibited by Minn.Stat. § 145.424.

The leading case in determining the line separating prohibited "wrongful-birth"

suits and permissible "wrongful-conception" cases is *Sherlock*. There, Sherlock underwent a vasectomy following the birth of the Sherlocks' seventh child. *Id.* at 171. The physician advised the Sherlocks to refrain from sexual relations or to take additional contraceptive measures until postoperative testing determined that Mr. Sherlock's semen was free of sperm. *Id.* After testing, the physician informed Sherlock that the test was "negative" even though the test revealed the presence of live sperm cells. *Id.* When Mrs. Sherlock subsequently became pregnant, the Sherlocks sued, claiming that the unplanned birth of their eighth child was a direct result of the doctor's negligent care. *Id.*

Permitting the Sherlocks' cause of action, the supreme court stated:

> We are not persuaded that public policy considerations can properly be used to deny recovery to parents of an unplanned, healthy child of all damages proximately caused by a negligently performed sterilization operation.

*Id.* at 174. The court went on to hold that such an action is properly characterized as wrongful conception and not wrongful birth because it is at conception that damage occurred. *Sherlock*, 260 N.W.2d at 174–75. The wrongful-conception suit, the court concluded, is exclusively reserved to parents, because it is they—and not the unplanned child—who have sustained the physical and financial injury caused by the physician's negligence. *Id.* at 175.

As in *Sherlock*, the plain language of Minn.Stat. § 145.424, subd. 2, does not prohibit respondents' cause of action. The legislature has seen fit to prohibit suits that allege that but for the negligent conduct, a child would have been aborted. Because respondents do not allege that appellants' negligence prevented them from obtaining an abortion, subdivision 2 does not prohibit this suit.

Appellants rely on Justice Simonett's concurrence in *Hickman v. Group Health Plan, Inc.*, 396 N.W.2d 10 (Minn.1986), to argue respondents' cause of action is a prohibited wrongful-birth claim. Drawing the distinction between permissible wrongful-conception cases and prohibited wrongful-birth claims, Justice Simonett wrote

> [i]n both cases, the plaintiff would not have had the child but for the negligence of the doctor, but the interests sought to be compensated are different. In the one case, there is the right not to conceive; in the other, there is the right not to give birth. In the one, it is the right not to have an unplanned child, while in the other it is the right not to have an unwanted child.

*Hickman*, 396 N.W.2d at 17 (Simonett J., concurring). Appellants argue that because respondents are asserting that M.M. was *unwanted* because of genetic defects, and not *unplanned*, they are alleging wrongful-birth.

But again, respondents do not allege that an abortion was sought or would have been sought as a result of M.M.'s fragile X condition—the crux of what Minn.Stat. § 145.424, subd. 2, prohibits. Instead, they claim that they wanted more children and that Molloy consulted with appellants, in part, to determine the likelihood that future children would be born with genetically transmitted disabilities.

This is a wrongful-conception claim because it alleges that conception would have been avoided had negligence not occurred. Because the plain language of Minn.Stat. § 145.424 does not bar respondents' action, it is permissible as a wrongful-conception cause of action.

## DECISION

The district court properly held that respondents owed Kimberly Molloy a duty of

care to advise her pursuant to the appropriate standard of care regarding S.F.'s genetic condition. No duty extended to Glenn Molloy because he is not a biological parent of S.F. The district court correctly concluded that Kimberly Molloy's cause of action accrued at the conception of M.M. because it was then that she sustained injury from appellants' alleged negligence. Finally, Kimberly Molloy's suit is not prohibited because it does not allege either a wrongful-birth or wrongful-life cause of action. Because she is not claiming that an abortion would have been performed had appellants' negligence not occurred, her suit is permissible under Minnesota law.

**Affirmed.**

WILLIS, Judge (Concurring specially).

Because I believe that the current state of the law in Minnesota leads inexorably to the result reached by the majority, I concur in that result. But I write separately because I also believe that the majority understates the policy implications of this opinion.

The majority notes, quite rightly, that under circumstances like those presented here, a malpractice claim could in theory be brought decades after a failed diagnosis. Many genetic diseases and conditions "skip" generations.[10] Therefore, the effective limitation on a claim based on misdiagnosis of a genetic condition becomes very unclear indeed. What is clear, however, is that short-term "tail" liability-insurance coverage after an event such as retirement will no longer be sufficient to protect the interests of a physician who was in any way involved in genetic testing.

The majority suggests that "the extent and number" of decades-old claims based on failed genetic diagnoses "is rank speculation." I suggest that the number of such claims that might be made is only a part of the implications of this opinion. I think that the fact that *any* such claim could be made will cause medical professionals, acting in their rational self-interests, to avoid to the greatest degree possible medical practice likely to involve genetic testing. That clearly is not in the public interest.

This appears to be yet another area in which technology is ahead of the law. The majority also observes that "it is the province of the legislature, not this court, to enact a statute of repose or to take other action to limit the risk to physicians, if that is the desired outcome." I believe that is an outcome very much to be desired. If the legislature does not act to somehow limit liability in cases like the one here, it is difficult to see where the next generation of geneticists willing to practice in Minnesota will come from.

---

10. *See, e.g.,* Brian R. Gin, *Genetic Discrimination: Huntington's Disease and the Americans with Disabilities Act,* 97 Colum. L.Rev. 1406, 1414 n. 45 (1997) (citing Anthony J.F. Griffiths et al., *An Introduction to Genetic Analysis* 27–28 (6th ed.1996)); D. Marianne Brower Blair, *Lifting the Genealogical Veil: A Blueprint for Legislative Reform of the Disclo-sure of Health–Related Information in Adoption,* 70 N.C. L.Rev. 681, 737 n. 291 (1992) (citing Catherine A. Reiser, *Basic Principles of Genetics: A Human Approach, in* Wisconsin Clinical Genetics Ctr. & Waisman Ctr. on Mental Retardation & Human Development, *Genetic Family History: An Aid to Better Health of Adoptive Children* 65–66 (1984)).