**LANGFORD TOOL & DRILL CO.,**
d/b/a Mason–Cutters, Plaintiff,

v.

**PHENIX BIOCOMPOSITES,**
**LLC, et al., Defendants,**

**Cooperative Centrale Raiffeissen–Boerenleenbank & Rabobank Nederland, et al., Respondents,**

**O'Rourke Electric, Inc.,**
**et al., Appellants,**

and

**PBL Investments, LLP, Appellant,**

v.

**Phenix Manufacturing Co., Inc., et al., Third–Party Defendants.**

No. C2–02–2146.

Court of Appeals of Minnesota.

Sept. 9, 2003.

Kenneth R. White, Law Office of Kenneth R. White, P.C., Mankato, MN, for appellants O'Rourke Electric Inc., O'Rourke Electric of Faribault Inc., Schwickert, Inc., Schwickert Company and PBL Investments, LLP.

Bradley N. Beisel, Hoeschler & Beisel, Minneapolis, MN, for respondents Rabobank and Dougherty.

Considered and decided by SCHUMACHER, Presiding Judge, RANDALL, Judge, and KALITOWSKI, Judge.

## OPINION

RANDALL, Judge.

On appeal from the district court's order granting respondent's mortgage priority over appellant's mechanic's lien, appellant argues (1) the project was not abandoned in April 1997, thus giving appellant's mechanic's lien priority; (2) appellant did not release its liens by signing the sworn construction statement; and (3) a new trial is warranted because the district court improperly admitted and relied on hearsay evidence. Respondents also filed a notice of review of the order denying their motion for partial summary judgment. On appeal, respondents argue the district court erred by finding (1) that the project consisted of a single improvement to the real estate rather than multiple improvements; and (2) Phenix and PBL are separate entities. Because we find that the project was abandoned in April 1997, we affirm the district court's order granting respondent's mortgage priority, and because we find no error, we affirm the district court's denial of respondent's motion for partial summary judgment.

## FACTS

Prior to 1994, Phenix Biocomposites, LLC (Phenix) secured the rights to an industrial process for turning agricultural waste into various particleboard products. This process required custom-made equipment and a building to house that equipment. Phenix located and chose a site in Mankato, Minnesota as the location for the

manufacturing plant. The plant was specifically designed to meet the needs of the production equipment, and construction began in December 1996. This plant in Mankato is the subject of this litigation.

In the spring of 1997, Phenix ran into financial problems, and by April, construction of the manufacturing facility virtually halted. Although various projects were completed after April 1997, such as projects to secure the building from the elements and to ensure that work already accomplished was not damaged, the projects were relatively minor, and were substantially completed by May or June of 1997. In the meantime, Phenix sought additional financing for the project.

A few months after Phenix ran out of capital, Phenix began negotiating with respondent Rabobank, a Dutch-owned bank, for a loan. The negotiations considered a condition that required Rabobank to receive from appellant, Schwickert, sworn construction statements containing Schwickert's representations regarding the amount of work it had yet to do on its contracts for the project, and concerning the total amounts of money due on its contracts. The statements, dated February 6, 1998, contained the following language:

> In the event of any such increase, no orders or claims will be made to said company until such deposits shall have been completed; that the purpose of said statement is to induce said company to pay out the proceeds of a loan of the amount to be determined accrued by a mortgage on said property; and that upon payment of the specific unpaid items listed herein, the undersigned contractor agrees to waive all claims of priority to said mortgage and both parties herein will hold such company harmless as to any other claims of priority of lien for any labor or material,

furnished or to be furnished, for completion of construction.

The Rabobank mortgage closed on April 17, 1998, and was filed on April 20, 1998. In December 1997, additional financing was also obtained from respondent, Dougherty Funding. The financing enabled construction to resume on the project.

By early 1999, Phenix was in default on its repayment obligations to Rabobank. Phenix was unable to pay the contractors and the contractors subsequently filed liens to protect their interests. Shortly thereafter, one of the lienholders initiated this action against Phenix to enforce its lien. Rather than simply relying on its mechanic's lien rights, Central Mechanical also pursued a money judgment against Phenix. On February 11, 2000, Central Mechanical obtained a money judgment against Phenix Entities in the amount of $686,105.66. Soon thereafter, Central Mechanical threatened to pursue collection remedies, including levying on Phenix's bank accounts.

On February 18, 2000, Phenix entered into a forbearance agreement with Central Mechanical. The agreement provided that Central Mechanical would refrain from exercising its collection remedies against Phenix until June 30, 2000, in exchange for Phenix's promise to pay the judgment by that time. The agreement was secured by the personal guarantees of eleven individuals, each of whom had some personal stake in the success of the business of the Phenix Entities.

On July 1, 2000, the day after the expiration of the payment deadline under the forbearance agreement, the guarantors entered into an "Investment Partnership Agreement" under which PBL Investments LLP (PBL) was formed. On July 31, 2000, Central Mechanical executed assignments of the mechanic's lien statement

and amended mechanic's lien statement in favor of PBL. These assignments were given pursuant to an assignment agreement dated July 28, 2000, between Central Mechanical, PBL and the Guarantors. Under the terms of the agreement, Central Mechanical in no way represented, warranted, or covenanted that the mechanic's liens would be enforceable by PBL. On September 11, 2000, PBL Investments was substituted for Central Mechanical in this litigation.

Respondent moved for partial summary judgment seeking to dismiss the PBL Investments LLP (PBL) lien on the grounds that it was a lien by the owner against its own land. Essentially, respondent argued that Phenix and PBL are the same entity. The district court determined that they are not the same entity and denied the motion. A bifurcated trial was held with only priority issues decided. The district court held that the project had been abandoned in April of 1997 and thus respondents, Rabobank and Dougherty's mortgages were prior to appellant's mechanic's liens. Appellant appealed the district court's decision and respondent filed a motion for review of the order denying their motion for partial summary judgment.

## ISSUES

I. Was the project abandoned in April of 1997, giving respondents' mortgages priority over the mechanic's liens?

II. Did appellant release its liens by signing the sworn construction statement?

III. Did the district court improperly admit hearsay evidence, thereby warranting a new trial?

IV. Did the district court err by finding that the project consisted of a single improvement to the real estate rather than multiple improvements?

V. Did the district court properly deny the respondent's motion for partial summary judgment?

## ANALYSIS

### I.

█ Appellant argues that neither the law nor the facts support the district court's ruling that the project had been abandoned, and thus the district court's decision should be reversed to establish the lienholders as the parties with priority. Whether a project has been "abandoned" is a mixed question of law and fact. When reviewing mixed questions of law and fact, "we will correct erroneous applications of law, but accord the trial court discretion in its ultimate conclusions and review such conclusions under an abuse of discretion standard." *Rehn v. Fischley,* 557 N.W.2d 328, 333 (Minn.1997).

█ Minn.Stat. § 514.05, subd. 1 (2000) states that all liens:

* * * shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had actual notice thereof. As against a bona fide purchaser, mortgagee, or encumbrancer without actual or record notice, no lien shall attach prior to the actual and visible beginning of the improvement on the ground, but a person having a contract for the furnishing of labor, skill, material, or machinery for the improvement, may file for record with the county recorder of the county within which the premises are situated, or, if claimed under section 514.04, with the secretary of state, a brief statement of the nature of the contract, which statement shall be notice of that person's lien only.

The statute purports to determine a definite point at which the lien takes effect, while balancing the interests of mortgage and lien holders. *Reuben E. Johnson Co. v. Phelps,* 279 Minn. 107, 112–13, 156 N.W.2d 247, 251 (Minn.1968). Where there is an abandonment of a project and a subsequent recommencement of work, mechanic's liens arising from the new work do not relate back to the original start of construction. *See City of Ortonville v. Geer,* 93 Minn. 501, 503, 101 N.W. 963, 964 (Minn.1904) (stating that where the erection of a building is one continuous undertaking, without anything suggesting an abandonment of the work, a mortgage executed after the commencement of the construction is subordinate to the lien claims of those who have contributed to the completion of the work).

Appellant argues that the project was not abandoned because, based upon a liberal construction of Minn.Stat. § 514.05, subd. 1, the engineering work and similar activities performed by appellant between April 1997, and April 1998, put respondents on notice that lienable activity was being performed at the site. We agree that liens in place are to be construed liberally in favor of the lien holders. But the evidence supports the district court's determination that the project was abandoned. The work on the project had stopped, the place was barricaded, and there were no trespassing signs posted on the property. The new lenders wanted to be sure all former liens were paid off, which they did. If the project were one continuous project, the process of paying off all former liens would likely not have taken place.

The district court's ruling is supported by appellant's concession that the liens in question were not filed prior to refinancing. Had the liens been filed before the refinancing, they would have been liens of record and would have been paid off in full with all the former liens of record. The liens at issue are for work admittedly completed *after* the refinancing. It is only because Phenix had a secondary round of financial troubles that appellants now want their post-financing work to have a priority over the two financing lenders, arguing that it does not matter when their work occurred because everything should relate back to the 1996 beginning of the project.

The record shows that respondent's attorney surveyed the project site and concluded that the project had been abandoned before the deal for the loan was closed. The two lenders wanted to be sure they started with a "clean slate," meaning no old liens before they put up new money.

We understand appellant's argument that there was just an 11–12 month cessation of work. But, the district court was aware of that limited time differential. The court took everything into account and weighed the facts of abandonment. We cannot find that the district court abused its discretion by concluding that the site had been abandoned.

Appellant also contends the project was not abandoned because "abandonment" requires a subjective intent to abandon the project. When determining what constitutes abandonment, there are competing rules of thought as to whether the intent to abandon is necessary. One view, known as the "Kansas rule," states that abandonment, is to be determined by the actual cessation of work, and not by the secret purposes of the owners. *Chicago Lumber Co. v. Merrimack River Sav. Bank,* 52 Kan. 410, 34 P. 1045, 1045–46 (1893).

In *Chicago Lumber,* the plaintiff argued that it was entitled to priority on a lien because abandonment does not take place until the owners arrive at the mental conclusion that they cannot proceed with the work. *Id.* at 1045. In considering the

plaintiff's claim that abandonment requires the "intent" to abandon a project, the court noted that:

> Perhaps the most common reason for the abandonment of work on improvements of all sorts is the want of means or ability to go on. Probably, in a majority of instances, the owner still desires and intends, if possible, to complete his project. He abandons actual operations, not of his own volition, but from the force of circumstances he cannot control.

*Id.* at 1046. But, the court stated that it would be a matter of very great difficulty to keep track of the mental operations of the owners. *Id.* at 1045. The court held that abandonment of work is a physical, visible condition, to be determined from an inspection of the premises, and thus when the owners ceased to do anything towards the completion of their building they abandoned the project. *Id.* at 1045–46.

In contrast to the "Kansas rule," the "Oregon rule" states that a finding of abandonment requires the "intent" to abandon the project as well as a cessation of labor. *Tri–City Bldg. Center, Inc. v. Wagner,* 274 Or. 581, 548 P.2d 961, 964 (1976); *Eastern & Western Lumber Co. v. Williams et al.,* 129 Or. 1, 276 P. 257, 259 (1929). The issue in *Eastern* also concerned what exactly constituted abandonment. The court stated that a mere cessation of labor is not an abandonment. *Id.* The court found that the lack of money caused a cessation of work, but was unaccompanied with a conclusion to abandon the project. *Id.* Therefore court concluded that there was no abandonment equivalent to completion. *Id.*

Despite the objectivity of the "Kansas rule," and the apparent subjectivity of the "Oregon rule," the rules are really very similar for purposes of the current appeal. Under the "Kansas rule," if there is a cessation of work, the project is abandoned. But, although the "Oregon rule" requires a decision to abandon as well as a cessation of work, even under the "Oregon rule," the mental intent to abandon *can be inferred from the physical actions.* Thus, under both rules, the actual termination of work can trigger an abandonment.

Here, the respondents concluded the project was abandoned, and the evidence supports this determination. Appellants passed on the chance before the refinancing to record their liens, so that there never would be any mistake as to their intentions. The physical, visible condition, to be determined from an inspection of the premises, is an essential element as part of determining whether a project has been abandoned (if there are prior valid liens of record, the inspection could be moot—we just have this case because there were no filed liens of record as to appellant and there is a claimed abandonment).

▪ Finally, appellant argues that having two levels of priority on one project is contrary to statute. In situations where a project has been abandoned, the crucial issue is whether the mortgagee has actual notice of prior liens. In *Kirkwold Const. v. M.G.A. Const. Inc.,* 513 N.W.2d 241, 244 (Minn.1994), the court stated that the plain language of Minn.Stat. § 514.05 provides that "only a bona fide purchaser or mortgagee without actual notice shall be given priority over mechanics liens." *Id.*

Here, the district court found that the project had been abandoned and that respondent did not have notice of appellant's lien. The facts of the case support the district court's findings. The mechanic's lien statute does not prohibit split priority of mechanic's lien claimants on a single project where the project has been abandoned *and* the mortgagee does not have actual notice of the prior lien. We con-

clude the district court did not err by finding that respondent's mortgages have priority over the mechanic's liens.

## II.

Next, appellant argues that the district court's finding that the sworn construction statement constituted a lien waiver is unsupported by evidence because (1) the statement is not signed by any party; (2) the record fails to support any assertion that respondent insisted on lien waivers as a condition of issuing the mortgage; and (3) the statement was secured without consideration. Both parties do not dispute the applicable law, but rather the facts that support the district court's decision. The district court's "ultimate" findings must be affirmed in the absence of a demonstrated abuse of the court's broad discretion. *Maxfield v. Maxfield,* 452 N.W.2d 219, 221 (Minn.1990).

▮ First, appellant's argument that the statement is invalid because it was not signed by any party is without merit. The evidence demonstrates that the statement was notarized by one of appellant's employees and delivered to the closing to be relied on by respondent. Second, appellant's argument that the record does not support any assertion that respondent insisted on the sworn construction statement as a condition of issuing the mortgage, fails. The record reveals that Scott Taylor, a loan officer for respondent Rabobank, testified that obtaining the sworn construction statement was a condition of issuing the mortgage. Kent Schwickert, one of the principals of appellant, Schwickert, Inc., also testified that it was his understanding that it was necessary for appellant to submit the sworn construction statement in connection with the securing of the additional financing that Phenix needed to continue the project. Third, the record shows that appellant received an additional $1,451,441 after the project resumed, demonstrating that the sworn construction statement was given in consideration of respondent issuing the mortgage to Phenix. The consideration, stated on the documents themselves, was "to induce [Rabobank] to pay out the proceeds of a loan of the amount to be determined accrued by a mortgage on the property." Appellant testified at trial that the consideration was respondent's agreement to make the loan from which appellant would be paid. The mortgage essentially provided the proceeds from which appellant was paid. Because the statement was signed and given for consideration, the district court did not abuse its discretion by finding that appellant subordinated its lien rights by signing the sworn construction statement.

## III.

▮ Appellant argues that the district court improperly admitted the affidavits of Timothy Engel, the Vice President of Phenix Manufacturing, and Tom Suprenant, an employee of Stahl Construction, and pleadings from the *Phenix v. Stang Construction* case. Absent erroneous interpretation of law, the question of whether to admit or exclude evidence is within the district court's discretion. *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 45–46 (Minn.1997). "Entitlement to a new trial on grounds of improper evidentiary rulings rests upon the complaining party's ability to demonstrate prejudicial error." *Id.* (quoting *Uselman v. Uselman,* 464 N.W.2d 130, 138 (Minn.1990)).

Appellant contends the evidence was improperly admitted under the admission by a party opponent exception to the hearsay rule because Phenix was not a party to this action and thus the affidavits and pleadings do not constitute admissions. The admission by a party opponent exception

provides that a statement is not hearsay if it is a party's statement and offered against the party. Minn. R. Evid. 801(d)(2). Although we question the district court's decision to admit the evidence, a thorough review of the file demonstrates that the outcome of the case would not have changed had the evidence been excluded. We conclude that a new trial on this issue is not warranted. *Cf.* Minn. R. Civ. P. 61 (stating harmless error must be ignored).

## IV.

 Respondent contends that the evidence submitted at trial compels the conclusion that, for mechanic's lien priority purposes, there were two separate improvements; one improvement, the "shell" improvement was for the construction of the building; and the other improvement, a "process" improvement, was the installation of the equipment used for a manufacturing process itself. Both parties agree that the question of whether labor performed was part of a separate improvement or part of one continuous improvement is a question of fact. Factual determinations are reversible only if they are clearly erroneous. *Morgan v. Illinois Farmers Ins. Co.*, 392 N.W.2d 37, 39 (Minn.App.1986), *review denied* (Minn. Oct. 22, 1986).

In *Witcher Const. Co. v. Estes II Limited Partnership*, 465 N.W.2d 404, 406 (Minn.App.1991), *review denied* (Minn. Mar. 15, 1991), this court was asked to determine whether a project consisted of one single improvement or two separate improvements. The project in *Witcher* involved two separate contracts, one for building renovation, and one for improvements to tenant areas. *Witcher Const. Co.*, 465 N.W.2d at 405. The court began by stating that the mere existence of separate contracts for stages of a project does not create separate improvements. *Id.* at 406. The court stated that construction work is considered a single improvement "if it is done for the same general purpose, or if the parts, when gathered together, form a single improvement." *Id.* at 407 (citing *Kahle v. McClary*, 255 Minn. 239, 241, 96 N.W.2d 243, 245 (Minn.1959)). The court noted that if there is little or no interrelationship between the contracts under which the project was performed, the project consists of separate improvements. *Id.* The court held that the project was a single improvement because the separate contracts included tasks relating to both phases, and the mortgage financing provided by the appellant covered both phases of the renovation. *Id.*

Here, the district court found that the people involved with the project described it as a single project. Phenix never contemplated construction of a warehouse, or other building, followed by some later decision to add the warehouse to hold the process equipment. All of the improvements for which the liens are asserted related to the construction of the particleboard manufacturing facility itself. The goal at the beginning of the project was to improve the real estate by building a fiberboard processing facility, and the purpose of obtaining the financing from respondent was to finish the original project. These factual findings are supported by the record, and the district court's finding that the project consisted of a single improvement is not clearly erroneous.

## V.

 Respondent also contends that the district court erred by denying its motion for partial summary judgment. When certified questions arise from a denial of summary judgment, the summary judgment standard applies; therefore this court must determine whether there are

any genuine issues of fact and whether the district court erred in its application of the law. *Molloy v. Meier,* 660 N.W.2d 444, 450 (Minn.App.2003), *review granted* (Minn. Jul. 15, 2003). A review of the record of a denial of summary judgment is viewed in the light most favorable to the nonmoving party. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993).

■■■■■■ Respondent argues that Phenix and PBL are the same entity, and thus the district court's denial of partial summary judgment was improper. Minnesota law states that a subordinate corporation which has no purpose or existence apart from the operation of its cooperative owners may be considered merely an agency or arm of the parent. *Community Hosp. Linen Svcs., Inc., v. Comm'r. of Taxation,* 309 Minn. 447, 456, 245 N.W.2d 190, 195 (1976). An owner of real property may not enforce a mechanic's lien against property that it owns. *Nelson v. Nelson,* 415 N.W.2d 694, 697 (Minn.App.1987).

Here, the evidence supports the district court's denial of summary judgment on this issue. Appellant claims that PBL and Phenix are separate entities. PBL and Phenix have limited common ownership. PBL members owned only 8.7 percent of Phenix, and thus neither entity had control over the other. In addition, the two entities have different purposes. Phenix existed to develop a particleboard manufacturing plant and to sell that product. Phenix had no interest in the Central Mechanical lien, other than to try to dispose of the lien. In contrast, PBL was interested solely in collecting the lien from Phenix. Furthermore, no Phenix funds were used to purchase the Central Mechanical lien, and the debt was paid with funds wholly unrelated to the respondent's loan. There were simply no inequitable or inappropriate conditions created. Respondent has not shown that, on this record, Phenix and PBL are the same entity, and the district court's denial of summary judgment was appropriate.

## DECISION

The district court did not err by finding that the project had been abandoned and thus respondent's mortgages have priority over appellant's mechanic's liens.

**Affirmed.**